553 So.2d 836 (1989)
AMERICAN BANK
v.
Ram S. SAXENA.
No. 89-CC-0927.
Supreme Court of Louisiana.
December 11, 1989.
Concurring Opinion December 13, 1989.
*837 William E. Brown, Linda R. Gallagher, Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, for plaintiff-applicant.
Lanny R. Zatzkis, Karen D. McCarthy, Lawrence E. Mack, Rhonda M. Benedetto, Law Office of Lanny R. Zatzkis, New Orleans, for defendant-respondent.
DIXON, Chief Justice[*].
Plaintiff bank filed three suits, seeking to enforce five delinquent promissory notes. Respondent debtor filed an answer and a number of reconventional demands, asserting defenses to the bank's claims. Plaintiff's motion for summary judgment in one of the three suits was denied. Subsequently, the three suits were consolidated and a motion for summary judgment in the consolidated suit was also denied, the trial judge finding a material question of fact. The court of appeal denied petitioner's writ application, reasoning the defendant is entitled to trial on the merits to resolve the issues of fact presented in the pleadings. We granted the plaintiff's writ application and now reverse in part and affirm in part.
The five promissory notes, ranging in value from 464,000 to $2,367,069, were signed in conjunction with loans defendant Saxena obtained from American Bank. Three of these loans were undertaken in connection with real estate ventures in which Saxena was involved, the Garden Vue Square Condominium Hotel, Garden Vue Lounge, and Condo Inns, Inc. The other two loans were "personal." All five of the notes matured on December 1, 1987, and the bank filed suit in January of 1988, alleging the notes were delinquent and seeking payment of the unpaid balances and accrued interest, plus attorney's fees for 257 of the principal and interest. In his answer, Saxena pleaded the affirmative defenses of compensation, set-off, estoppel, failure of consideration and error. He also made reconventional demands, alleging failure of consideration, misrepresentation, and duress, and sought $10,500,000 in damages for lost property value and other injuries.
Sometime prior to 1982, Saxena bought three condominiums in each of two different projects, the Bordeaux and the Futura, from Frank Gatlin, head of Gatlin Construction Company. According to Saxena, Gatlin was the kind of guy "who would walk in your office every morning with a project." Gatlin also tried to impress Saxena with his position as a member of American Bank's advisory board. At some point after the two men had begun to do business with each other and on one of his visits to Saxena, Gatlin brought along the then-president of American Bank, Richard Hollan. Gatlin presented Saxena with documents showing projected costs and revenues *838 of a proposed development called the Garden Vue Square Condominium Hotel, a project to be built in Kenner with a purported preconstruction appraised value of $4,500,000. After a series of meetings between Gatlin and Saxena at which this project was discussed, Hollan agreed, on behalf of the bank, to provide construction financing and Saxena decided to invest in the project.
Subsequently, Saxena and Gatlin formed RF Enterprises, a partnership owned 51% by Saxena and 49% by Gatlin. Saxena provided $200,000 in certificates of deposit as security for the loan, as well as money to buy the land for a building site. Meanwhile, Gatlin's contribution to the project was to make the construction decisions, hire the subcontractors and supervise the project. (Saxena apparently provided the wherewithal behind RF Enterprises. He claims he made Gatlin several loans, the largest being $10,000, none of which were repaid). Gatlin built the condominiums and, as he sold each of the units, paid off the construction loan. He and Saxena each bought five of the eighty units in the hotel; Saxena's five units were financed at a lending institution other than American Bank. Shortly thereafter, Saxena bought five more units from the roofing subcontractor, who had decided he no longer wanted them. This purchase apparently was also financed at an institution other than American Bank.
It was not until some five years after these events that, Saxena contends, he learned Hollan had made but failed to keep certain preconstruction commitments: that the bank would supervise Gatlin's construction, and that it would obtain a post-construction preclosing appraisal of the property. Saxena has not produced the letter which he claims memorialized these agreements, nor does the record show he made any investigation as to whether these alleged commitments had been fulfilled. In addition, Saxena admits he made no effort to ascertain the value of the condominiums, but instead claims he relied totally on Gatlin and Hollan. He has raised these allegations in answer to the bank's suit on notes unrelated to the initial construction loan.
Long before these troubles, when everything still was, in his words, "goody-goody," Saxena obtained a 1983 loan of $120,336 from American Bank, the purpose of which was to provide operating capital for Condo Inns, Inc., an organization created to manage the Garden Vue Square Hotel. Originally, there were three or four owners of Condo Inns, with Gatlin and a relative in charge of the hotel's day-to-day operation. Then, in part because the hotel was losing money, Gatlin decided to pursue other interests and in 1984 Saxena bought all of the stock in and assumed sole ownership of Condo Inns. In the meantime, the 1983 loan for operating capital has never been paid off and is one of the loans being sued upon.
Gatlin had apparently sold many of the condominiums in the Garden Vue Hotel to various individuals, including several of the subcontractors on the project, who later decided they did not want their units. As a result, Saxena alleges that in 1984 Gatlin and Hollan approached him and asked whether he wanted to buy an additional thirty-two units. Saxena, claiming he relied on assurances by Hollan that the property was worth what he was paying for it, agreed and consequently undertook the largest of the five loans involved in this suit, the one supported by a note for $2,367,069. Again, Saxena made no independent effort to determine the worth of these units but claims he merely relied on assurances by Hollan and Gatlin that the units, for which he was paying an average of $79,600 each, were worth that much or more. It was not until 1987, in connection with domestic proceedings, that Saxena obtained an independent appraisal of the property purportedly showing the thirty-two units have a total value of as little as $900,000.
Around the same time in 1984 when he purchased these additional condominiums, Saxena also purchased the Garden Vue Lounge, because the person who owned it wanted to sell, and Saxena wanted to keep a lounge in the hotel. That purchase was financed by American Bank and the promissory note supporting the loan is *839 also one that the bank is trying to enforce. Saxena contends the individual from whom he bought the lounge misrepresented the amount of profits the lounge was making; however, the seller is not a party to this suit and any such allegations of fraud are irrelevant to enforcement of the note. The final two promissory notes supported personal loans.
Saxena also asserts the bank acted without authority in pledging, cross-pledging, appropriating and applying to the disputed loans some of the nearly $1,300,000 he had invested in certificates of deposit at the bank. Saxena contends the bank has never rendered an adequate accounting of either the amount of CDs he had purchased, the amount of interest owed on the CDs, or the current status of the funds he had invested in CDs. Furthermore, he claims the bank has failed to furnish an accounting of outstanding amounts due on the loans showing credit for payments made on the notes.
In its memorandum supporting the consolidated motion for summary judgment, the bank argues Saxena does not deny that he made the loans, that he received the money, that he pledged some of the CDs as collateral for the loans, or that the loans are in default. The bank acknowledges having cashed two pledged CDs, in the total amount of $240,000, and applied them to the $2,367,069 delinquent loan in accord with provisions of the collateral pledge agreement signed by Saxena. The bank also asserts the total amount of Saxena's CDs was $1,266,052 rather than the $1,300,000 he claims. With the exception of the $240,000 of pledged funds, the bank claims the value of the CDs has been returned to Saxena. In support of this claim, the bank produced a number of canceled checks and a handwritten accounting of the purported disposition of these funds.
Also in support of its consolidated motion for summary judgment, American Bank produced the affidavit of its current president listing the amount of principal and interest due on each of the loans. The bank argues that Saxena's claims are unliquidated and cannot be interposed against its own liquidated claim for the delinquent amounts. Moreover, the bank argues Saxena's reconventional demands relate to merely one of the five loans involved in this suit and thus cannot be asserted as a defense to the other four loans. Furthermore, American Bank argues Saxena's claims concerning misrepresentation and duress have prescribed, since alleged wrongdoing on the part of the bank took place several years before suit on the reconventional demands was filed.
The trial judge referred the prescription question to the merits and denied the motion for summary judgment, finding that a material question of fact existed. The court of appeal denied the writ. We granted the bank's application for supervisory writs to examine the propriety of the lower court rulings.

THE PROMISSORY NOTES
All of the notes being sued upon were preexisting obligations, renewed on December 1, 1986, and all matured on December 1, 1987. Saxena admits the loans are delinquent. He claims, however, that he stopped making payments on them only after Darryl Chauvin, current president of the bank, promised to return the value of the disputed $240,000 CD but applied this money to the loans instead. The bank originally filed three suits involving five notes. One of the notes was for purchase of thirty-two condos in the Garden Vue Square Condominium Hotel, one for purchase of the lounge in the hotel, one for operating capital to Condo Inns, Inc. which manages the hotel, and the other two were for personal loans. All three suits were filed January 5, 1988. For purposes of clarity, we consider the suits as they were presented to the district court.
Suit 356-233. Suit was on two promissory notes for two personal loans. The initial summary judgment motion was heard and denied in this suit alone.
(a) Promissory note 12345 was in the principal face amount of $150,000. Saxena agreed to make eleven monthly payments of $1800 and a final installment (on December 1, 1987) of $142,596.94. Saxena claims he made payments on this note but has *840 produced no proof of such payments, arguing the bank's records would reflect the amount of payment. The bank, meanwhile, gave Saxena credit for some amount of payment since it sued for only $143,922.53 in delinquent principal, $7,753.55 in accrued interest, plus additional interest from November 9, 1987 until date of judgment. The bank contends its records show the loan was undertaken a year before Saxena purchased the additional thirty-two units and was for the purpose of a personal investment. The note was unsecured.
(b) Note 12346 was in the principal face amount of $68,128.12. Saxena agreed to make eleven monthly payments of $1400 and a final installment on December 1, 1987 of $58,079.82. Saxena alleges he made an undetermined number of payments, which he again contends the bank's records would reflect. The bank apparently deducted some amount of payment, since it sued for the delinquent amount of only slightly more than the final payment, seeking $60,605.19 in principal, $3,274.14 in accrued interest and additional interest from November 9, 1987 until date of judgment. This note was also unsecured. Bank records indicate Saxena used the proceeds to pay off a loan at another bank and the bank thus argues the note is unrelated to investment in Garden Vue Square.
In its memorandum in support of summary judgment, the bank contends Saxena does not deny these two notes have matured and are in default, but instead merely asserts unliquidated "lender liability" claims which are all related to the $2,367,000 loan sued on in Suit # 356-234, infra, and which can therefore not be urged as defenses in this suit.
In response, Saxena argues the notes are all interrelated and claims all five of these notes were undertaken because he believed his initial investment in the condominiums was worth what the bank told him it was. Saxena contends his claims are liquidated, since ascertainable, because he made payments on these loans for which he contends he never received an accounting. He also contends the bank applied a $150,000 CD to these two loans, and that his payments and the applied CD should have substantially reduced the amount owed. The bank's accounting of Saxena's CDs does not show application of a $150,000 CD to any of the loans. Saxena has produced no evidence showing that he had a $150,000 CD at American Bank which might have been applied to the loan and his unsubstantiated assertion that such is the case does not entitle him to credit for that amount.
Suit 356-234. This suit sought enforcement of two promissory notes, which the bank has called Note A and Note B. Note A supported the loan for purchase of the thirty-two additional condominium units and Note B supported the loan for purchase of the Garden Vue Lounge.
(a) Note A supported loan # 14944 made in 1984 for purchase of thirty-two Garden Vue Square Condominiums at an average cost of $79,600 each; the note has a face amount of $2,367,068.93. Contending the units are worth as little as $900,000, Saxena seeks damages of $1,500,000 in lost property value. The date of the original loan is not in the record. However, the promissory note was renewed on December 1, 1986 and called for eleven monthly payments of $20,542 and a final payment (due December 1, 1987) of $2,340,500.51. The bank recognizes some amount of payment or applied collateral since it sought $2,095,499.97 (an amount less than the amount of the final payment), plus accrued interest of $118,673.16 with additional interest from November 9, 1987 until date of judgment. This note was secured by two collateral pledge agreements (CPAs).
(i) CPA 10115 is a demand collateral mortgage note dated May 31, 1984 in the amount of $3,000,000. The note is paraphed "ne varietur" for identification with an act of collateral mortgage on the thirty-two Garden Vue Square Condominiums.
(ii) CPA 10112 pledged the disputed $240,000 in CDs which Saxena alleges the bank promised to release to him. The bank acknowledges it appropriated the CDs and applied them to this loan in accord with the terms of the pledge agreement, which provided for such action in the event of default. We find no merit to Saxena's contentions *841 that he was coerced into repledging the value of the CDs. The fact that the bank required the repledging of the CDs does not constitute coercion which would invalidate the pledge. Saxena further claims the bank placed the interest on these CDs into a separate account and that such interest has neither been paid to him nor accounted for. The bank, meanwhile, contends it has accounted for Saxena's CD funds by producing the handwritten record and copies of canceled checks issued to Saxena or to GEO, his geological consulting business.
Also of relevance to determination of the amount owed on this note is the bank's acknowledgment, in a post-argument brief submitted to this court, that between January 1988 and September 14, 1989, $207,681.78 in payments were received under a Keeper Order for the thirty-two condominiums. The bank admits that these payments apply to this loan and that they should be subtracted from the amount it sought in its summary judgment petition.
(b) This suit also sought enforcement of Note B which supported loan # 14915, undertaken in connection with purchase of the Garden Vue Lounge. The principal face amount of the note is $64,090.69. Saxena agreed to make eleven monthly payments of $795.00 with a final payment, due on December 1, 1987, of $60,630.14. Saxena makes no specific allegations of payment on this loan. The bank apparently recognizes an undetermined amount of payment since its petition sought $60,166.91 (a little less than the amount of the final payment), accrued interest of $2,347 plus additional interest from November 9, 1987 until date of judgment.
Security for this note was CPA 10117, a collateral mortgage note on the lounge in the amount of $100,000. Although the Keeper Order applies to the lounge as well as the condos, the bank says no payments on this loan have been received under that Order. Saxena contends he purchased the lounge based on misrepresentations concerning the amount of its profits. However, the seller of the lounge is not involved in this suit nor is he alleged to have had a connection to American Bank. Those allegations therefore provide no defense to the note.
Suit 356-236. Suit was brought to enforce loan # 14927 which was made in 1983 to Condo Inns for operating capital. Originally, the bank brought suit only against Condo Inns, which is now in bankruptcy. The petition was later amended to include Saxena. As security for this note, Saxena signed a continuing guaranty dated June 1, 1983 in the amount of $101,000.
The face amount of the note was $120,335.58 and the payment agreement called for eleven monthly payments of $2,996.06 with a final payment, due December 1, 1987, of $96,925.59. In its petition, the bank sought $100,882.18 in principal balance, plus accrued interest of $3,943.47, and additional interest from November 9, 1987 until date of judgment. This is the only note for which the bank's ledger card is in the record. That document appears to show the most recent transaction involving this note was on October 6, 1987 when the outstanding balance was $103,848.24. As noted above, the bank's petition sought less than this amount. Saxena does not specifically allege payment on this note, but he contends the misrepresentation as to the value of the condos and his investment on that basis led to the necessity of undertaking this later loan. Bank records, on the other hand, show Saxena did not buy the additional thirty-two units until more than a year after this loan was made.

ANALYSIS
American Bank sought review of the orders of the trial court (1) denying its exception of prescription to the defendant's "lender liability" reconventional demands, and (2) denying its motion for summary judgment on the notes.
The bank contends the denial of its exception of prescription was in error because Saxena's deposition shows he had knowledge that the condominiums were worth less than he had paid six months to a year after he assumed management of the hotel in 1984. Saxena, on the other hand, contends he only learned of the property's *842 decreased value when he obtained the November 1987 appraisal. The trial judge referred the question of prescription to the merits, finding a material issue for trial because of the factual dispute as to when Saxena became aware of the alleged misrepresentations concerning the value of these properties.
"If the peremptory exception [of prescription] has been pleaded in the answer, or subsequently, but at or prior to the trial of the case, it shall be tried and disposed of either in advance of or on the trial of the case...." C.C.P. 929(B).
Since the exception was pleaded after the bank's answer to the reconventional demands, the trial judge's decision to hear the prescription issue at trial was appropriate. Whether Saxena's reconventional demands have prescribed can be decided upon the trial on the merits.
In order to determine whether the denial of the motion for summary judgment was proper, it must first be determined whether the bank is entitled to enforcement of the notes and, if it is, whether Saxena can defeat summary judgment of those notes by asserting unliquidated "lender liability" claims as set-off or compensation.
Under the Uniform Commercial Code, a "holder" is a person who is in possession of an instrument drawn or issued to him or his order. R.S. 10:1-201. A negotiable instrument must (a) be signed by the maker or drawer; and (b) contain an unconditional promise to pay a sum certain in money; and (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer. R.S. 10:3-104. All five of these promissory notes were signed by Saxena as maker, contained an unconditional promise to pay sums certain in money, were payable on December 1, 1987, and were made to the order of American Bank. Therefore, the bank is a holder and, subject to claims of payment or satisfaction under R.S. 10:3-306, may enforce payment in its own name. R.S. 10:3-301.
Unless specifically denied in the pleadings each signature on an instrument is admitted. R.S. 10:3-307(1). When signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense. R.S. 10:3-307(2).
"... Once signatures are proved or admitted, a holder makes out his case by mere production of the instrument, and is entitled to recover in the absence of any further evidence. The defendant has the burden of establishing any and all defenses, not only in the first instance but by a preponderance of the total evidence...." R.S. 10:3-307, comment 2. (Emphasis added).
Saxena has not denied his signatures on the instruments being sued upon and they are thus admitted. Saxena also does not deny that he made the loans, received the monies, or pledged collateral. Nor does he deny that the notes are in default. Thus, the bank has met its initial burden by producing the signed instruments and is entitled to recover unless Saxena establishes a defense by a preponderance of the evidence.
The payee may be a holder in due course, R.S. 10:3-302(2), if he takes an instrument for value, in good faith, and without notice of any defense or claim against it. R.S. 10:3-302(1). Against a holder in due course, the maker is limited to asserting "real" defenses, including fraud in the factum and duress, as provided in R.S. 10:3-305. Because Saxena has not established by a preponderance the available defenses allowed against a holder under R.S. 10:3-306, we need not consider the question of whether the bank's status is that of a holder in due course. Unless he has the rights of a holder in due course
"any person takes the instrument subject to
. . . . .
(b) all defenses of any party which would be available in an action on a simple contract; and
(c) the defenses of want or failure of consideration, ..." R.S. 10:3-306(b)(c).
Among other defenses, Saxena raises those of failure of consideration, duress, misrepresentation, and payment.
*843 The arguments concerning failure of consideration and misrepresentation assert the thirty-two condominiums are not worth what Saxena paid for them. He alleges the bank misrepresented the value of the condominiums and that he purchased the units in reliance on that misrepresentation. Hence, he argues, the note supporting the loan made on those condominiums is unenforceable. The bank correctly asserts these defenses relate only to the $2,367,000 loan and not to the other four notes being sued upon. Even with respect to that loan, however, we find the arguments without merit.
Fundamentally, Saxena's argument is flawed because the only contracts between the bank and Saxena are the promissory notes themselves and his alleged defenses are unrelated to those contracts. Saxena, along with his partner in RF Enterprises, Frank Gatlin, developed this property. He claims not to have consulted an attorney, an accountant, or an appraiser either prior to his initial purchase of five units from RF Enterprises, or prior to the subsequent purchase of the thirty-two additional units. Instead he contends he decided to invest in the property in total reliance on what he alleges Gatlin and the bank told him. He charges Gatlin was the seller and, since he was a member of the bank's advisory board, was acting as an agent of the bank.
The record shows Saxena is not a novice real estate investor, that these condominiums were not Saxena's initial investments, and that he was involved with Gatlin before and after RF Enterprises developed Garden Vue Square. Moreover, Saxena apparently bought these thirty-two additional condominiums from neither the bank nor from Gatlin but from other unnamed individuals. The bank merely loaned Saxena the money he used to purchase the condominiums; the consideration for the promissory note was obviously the money loaned. In considering another case involving enforcement of a promissory note, we said, "When the loan was made, defendant became impliedly bound to pay the indebtedness arising, and the note was given as evidence of his personal obligation to do so. It is therefore too clear for discussion that the note was given for a valuable consideration." Priest v. Wenzel, 168 La. 679, 680, 123 So. 121, 122 (1929). The defense of lack of consideration is without merit.
Similarly, Saxena has not shown misrepresentation by the bank. He has not claimed that he was induced by trickery or deceit to sign the notes, or that he was fooled as to the nature of what he was signing. Instead, Saxena claims the bank agreed to supervise Gatlin's construction and to obtain a preclosing, post-construction appraisal of the condominiums in 1982. First, these claims are not connected to any of the five notes which the bank seeks to enforce but involve alleged agreements made in connection with the initial construction of the condominiums and relate to a construction loan paid off in 1983. Second, aside from his bare allegation, Saxena has not produced any evidence which would support his claim that Hollan, as representative of the bank, made these alleged commitments. He also has not shown that Gatlin was an agent or employee of the bank or that his actions as a member of the bank's advisory board can be the basis of imputing liability to the bank. Although the record does show the bank might have discovered in 1986 that the condominiums might indeed have been worth less than Saxena paid for them, the record does not suggest Hollan or other bank officers knew at the time of the 1984 loan that the condominiums were worth less than what Saxena was paying. In fact, the bank appears to have relied, as did Saxena, on the $4,500,000 preconstruction appraisal.
Similarly, Saxena's claim of duress is without merit since he does not assert that he was coerced into buying the thirty-two condominium units or forced to undertake the other four loans. Instead he merely asserts that in 1985 he was forced to repledge CDs in order to obtain renewal of the loan on the condominiums. As we discussed above, such conditional renewal of a loan does not invalidate the pledge. Furthermore, the bank points out that subsequent to this "forced" repledge, Saxena voluntarily repledged the CD when he last *844 renewed the note in December of 1986. The claim is without merit.
Finally, in an amended reconventional demand, Saxena alleged payment as a defense to the two personal loans. "[P]ayment must be specifically pleaded and proved by the litigant asserting it." T. Hofman-Olsen, Inc. v. Northern Lumber Manufacturing Co., Inc., 160 La. 839, 846, 107 So. 593, 595 (1926). Although Saxena charges the bank's accounting of his CDs is inadequate, he has not provided any evidence in support of this claim. Saxena has not produced evidence of payment on any of the five loans but admits that he depends on the bank's records to establish the payments made, all the while contending he has not been credited for the full amount. "The ... plea of payment is an affirmative defense, and the burden is upon the pleader to prove payment." Orleans Discount Co., Inc. v. Derbes, 170 La. 660, 662, 129 So. 121 (1930). Saxena seeks to place the burden of production on the bank and has, therefore, failed to meet the burden of proof.
For these reasons, we find Saxena has not met the burden of establishing that defenses to the notes exist. R.S. 10:3-306, comment 2. Saxena's theories of potential recovery do not relate to the contracts between him and the bank but rather involve allegations of wrongdoing and are grounded in tort.[1] However, Saxena further argues that even if his claims do not provide defenses to the notes, he should be allowed to use them as set-off or compensation against the amount he owes the bank. Thus, he argues, the interposition of these claims requires the summary judgment motion be denied. The doctrine of compensation is inapplicable.
Set-off, or to use the codal term, compensation, takes place by operation of law when two persons owe to each other sums of money and these sums are liquidated and presently due. In such a case, compensation extinguishes both obligations to the extent of the lesser amount. C.C. 1893.
"The two debts must be equally liquid.... [A] liquid debt [is] one whose existence is certain and its quantity determined. A disputed debt is not liquid and cannot be admitted as susceptible of compensation unless the one who asserts compensation has in hand the proof of the existence of the disputed debt and is thus in a position to prove it promptly." 4 Aubry & Rau, Cours de Droit Civil Francais, s. 326 (6th ed. 1965).
A claim is liquidated when the debt is for an amount capable of ascertainment by mere calculation in accordance with accepted legal standards. Sims v. Hays, 521 So.2d 730, 733 (La.App. 2d Cir. 1988). Thus, a determination as to the liquidity of a claim is an essential prerequisite to deciding whether such a claim is a proper basis for a plea of compensation. Lack of sufficient liquidity and demandability will preclude such a plea. Hartley v. Hartley, 349 So.2d 1258 (La. 1977) (husband's potential claim against community funds could not be used as compensation against wife's claim for past due alimony).
Civil Code article 1893 must be read in conjunction with the rule providing that a party who asserts that an obligation is null, or that it has been modified or extinguished, must prove the facts or acts giving rise to the nullity, modification, or extinction. C.C. 1831. Under these rules, the burden of proof is placed on the proponent of the plea of compensation.
Here Saxena's failure to deny that he made the loans, signed the notes or received the monies means he has admitted the debt. As for his claims against the bank, we find Saxena has not supported his factual allegations and has failed to establish *845 that a genuine issue concerning liability on the notes exists. Since Saxena has established no defenses to the notes, he is thus obligated to pay a sum of money that is liquidated and presently due.
"When a motion for summary judgment is made and supported ... [by affidavits, depositions and answers to interrogatories], an adverse party may not rest on the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him." C.C.P. 967, par. 2.
Thus, on the showing made, summary judgment for the bank on the issue of liability is proper unless Saxena has been able to show that compensation is in order.
However, we find no such showing has been made. Saxena's reconventional demands seek damages in tort, are heavily contested, and may or may not lead to recovery. Thus the debt defendant owes plaintiff has been admitted, while plaintiff denies liability for the debt claimed by defendant. Because the two obligations are clearly not equally liquidated and presently due, defendant has failed to meet the burden of proof and compensation is therefore not available.
Our prior jurisprudence has barred the application of compensation to tort claims. Calvert Fire Insurance Company v. Lewis, 231 La. 859, 863, n. 1, 93 So.2d 194, 195, n. 1 (1957); see also Franz v. Schiro, 136 La. 841, 67 So. 925 (1915). Our courts of appeal in similar cases have decided that an unliquidated claim for damages may not be off-set against a liquidated claim. See e.g., Gulf Federal Savings and Loan Association v. Nugent, 528 So.2d 785 (La.App. 3d Cir.1988); Coburn v. Commercial National Bank, 453 So.2d 597, 605 n. 2 (La.App. 2d Cir.1984).
In a case similar to the instant one, American Bank & Trust Company in Monroe v. Carson Homes, Inc., 344 So.2d 456 (La.App. 2d Cir. 1977), writ denied, 346 So.2d 221 (La.1977), the trial court granted summary judgment to plaintiffs seeking enforcement of a promissory note. The defendants appealed, arguing the grant of summary judgment was in error in light of their reconventional demand for damages for fraud, deceit, and misrepresentation. Those allegations were not urged as a defense to the demands of plaintiff, but were asserted as a separate cause of action for damages by reconventional demand. As is the case here, the allegations of fact made by defendants in their reconventional demand were not directed at any invalidity in the confection of the notes or mortgages sued on. Instead those claims related to damages suffered as the result of the bank's failure to carry out an alleged commitment to provide financing for defendants' construction project. The court of appeal correctly upheld the grant of summary judgment, finding that defendants' action for fraud was separate and distinct from the undisputed issues covered by the partial summary judgment. American Bank & Trust Company in Monroe v. Carson Homes, Inc., supra at 459.
Summary judgment is designed to dispose of frivolous demands and defenses. It is appropriate only when there is no genuine issue of material fact and mover is entitled to judgment as a matter of law. C.C.P. 966; Schaefer v. Lynch, 406 So.2d 185, 187 (La. 1981). The well settled rule is that a motion for summary judgment should be granted if, and only if, the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, show that there is no genuine issue as to material fact, and that mover is entitled to summary judgment as a matter of law. C.C.P. 966; Thornhill v. Black, Sivalls & Bryson, Inc., 394 So.2d 1189, 1191 (La.1981). The burden is on the mover to show clearly that there is not a genuine issue of material fact in dispute, and any reasonable doubt as to the existence of a genuine issue of material fact must be resolved against the mover and in favor of trial on the merits. Industrial Sand and Abrasives, Inc. v. Louisville and Nashville Railroad Company, 427 So.2d 1152, 1153 (La.1983). On the other hand, it is clear that the opposing party is not entitled to have the motion denied on the mere hope *846 that at trial he will be able to discredit movant's evidence; he must, at the hearing, be able to point out to the court something indicating the existence of a triable issue of material fact. 6-Pt. 2 Moore's Federal Practice s. 56.15[4].
We find there is no genuine issue of fact concerning liability on the five promissory notes. Saxena has established no defenses against enforcement of the notes. He has produced no testimony or other factual evidence supporting his claim that he did not get sufficient credit for reductions to the amounts owed on these five notes. The claims raised in his reconventional demands are separate and distinct from the question of liability and thus cannot be urged as set-off against the claims of the bank. We therefore hold the bank's motion for summary judgment was improperly denied and accordingly reverse the lower courts' rulings and order summary judgment for enforcement of the five notes. The trial court is ordered to compute the sum due the bank, taking into account the sum the bank has acknowledged receiving under the Keeper Order and interest due on the principal amount of the notes at 8.5% from November 8, 1987 through date of this judgment. The remaining issues, which include the claims raised in the reconventional demands, the question of prescription, and the question of whether and what amount of attorney fees the bank may be entitled to, are preserved for trial.

DECREE
The judgment of the district court is reversed in part; summary judgment is rendered for the bank for enforcement of the promissory notes. The validity of the collateral pledge agreements and the collateral mortgages is recognized.[2] The trial judge's decision to refer the question of prescription to the merits is affirmed. The case is remanded to the district court for computation of principal and interest due on the notes and for further proceedings consistent with this opinion.
CALOGERO, J., concurs for reasons assigned by LEMMON, J.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring.
When there is a principal demand and a reconventional demand and either party moves for a summary judgment, the court generally may render judgment if there is no genuine issue of material fact and the mover is entitled thereto as a matter of law. La.C.C.P. art. 966B. If there are no triable issues of fact as to the principal demand but there are as to the reconventional demand, or vice versa, the court may render summary judgment as to the demand which does not involve a genuine factual issue. See Moore's Federal Practice ¶ 56.17[15] (1988). One reason for my voting to grant certiorari in the present case was to determine whether the court has the discretion to withhold granting a summary judgment as to the demand in which there is no genuine issue of fact (or stay the enforcement of the judgment on that demand) until the rendition of judgment on the other demand.
La.C.C.P. art. 1038 provides:
The court may order the separate trial of the principal and incidental actions, either on exceptions or on the merits; and after adjudicating the action first tried, shall retain jurisdiction for the adjudication of the other.
When the principal and incidental actions are tried separately, the court may *847 render and sign separate judgments thereon. When in the interests of justice, the court may withhold the signing of the judgment on the action first tried until the signing of the judgment on the other, (emphasis added).
Article 1038 thus provides authority to the court, when the demands are tried separately and the interests of justice are served thereby, to withhold signing of the judgment on one demand until the signing of the judgment on the other. This authority is broad enough to authorize withholding signing of the judgment in a demand tried by summary judgment until the signing of the judgment on the other demand, if the interests of justice dictate the use of such discretion.[1] Therefore, although there may be no genuine issue of material fact on the principal demand in a particular case and the mover may be entitled to summary judgment as a matter of law, the trial court is not required to render judgment if the interests of justice dictate withholding signing of that judgment until the signing of the judgment on the reconventional demand. Of course, the court may abuse the discretion afforded by Article 1038, but each case must be decided on its own merits.
In the present case the trial judge did not exercise the option available under Article 1038 to grant the bank's motion for summary judgment and withhold signing the judgment. The judge simply denied the motion. This judgment is clearly correct as to four of the five notes.[2] Although the question of a summary judgment on the $2,367,069 note is closer, I cannot say the majority is in error.
NOTES
[*] Honorable Daniel W. LeBlanc, Judge, Court of Appeal, First Circuit, participated in this case in place of Associate Justice Jack Crozier Watson, recused.
[1] In addition to the claims discussed above, Saxena's reconventional demands allege bad faith, negligence and breach of a fiduciary duty. We do not address the merit of those claims but do note Saxena has failed to support his claim that the bank owed a duty to obtain a post-construction appraisal or to supervise Gatlin's construction. In addition, claims concerning violations of the Louisiana Blue Sky Laws and Louisiana Condominium Law involve wrongs allegedly committed by Gatlin as agent for the bank; as noted above, this record before us does not support a finding of agency.
[2] The notes sued upon in Suit 356-234 were both supported by collateral pledge agreements pledging collateral mortgages on the thirty-two additional condominiums and the Garden Vue Lounge. The loan for the condominiums was secured by collateral pledge agreement 10115 by which Saxena pledged a $3,000,000 collateral mortgage note paraphed "ne varietur" for identification with an act of collateral mortgage passed before Alvin A. LeBlanc, Jr., Notary Public, dated May 31, 1984, recorded in Jefferson Parish, Louisiana in MOB 920, Folio 921. The loan for the lounge was secured by collateral pledge agreement 10117 by which Saxena pledged a $100,000 demand collateral mortgage note paraphed "ne varietur" for identification with an act of collateral mortgage passed before Jerome M. Volk, Jr., Notary Public, dated May 16, 1984, recorded in Jefferson Parish, Louisiana in MOB 919, Folio 754.
[1] Use of this discretion effectively does away with the necessity of trying one of the demands, but prevents execution of a judgment on that demand until the other demand is tried and adjudicated. See La.C.C.P. art. 1038, Official Revision Comment (b).
[2] The one suit on five notes is a proper cumulation of five actions. See La.C.C.P. art. 462. Therefore, the court would have been authorized to render a partial final judgment dismissing four of the five cumulated actions. See La.C.C.P. art. 1914.