ST. BERNARD SAVINGS AND
LOAN ASSOCIATION

v.

Joy Levet, Wife of/and George
A. CELLA, III.

Civ. A. No. 91–4493.

United States District Court,
E.D. Louisiana.

June 22, 1994.

M. Claire Rosenzweig, Bronfin and Heller, Paul J. Mirabile, Edward T. Suffern, Gary S.

**1168**

Brown, Middleberg, Riddle & Gianna, New Orleans, LA, for St. Bernard Sav. and Loan Ass'n, Resolution Trust Corp., as Receiver for Oak Sav. Tree Bank, S.S.B. and Conservator of Oak Tree Federal Sav. Bank, S.S.B., Oak Tree Sav. Bank, S.S.B., fka St. Bernard Sav. and Loan Ass'n.

Patrick D. Breeden, Patrick D. Breeden, New Orleans, LA, for Joy Levet, wife of/and George A. Cella, III.

Michael Delesdernier, Sidney D. Torres, III, Law Offices of Sidney D. Torres, III, Chalmette, LA, for James Kitto.

Regina C.S. Wedig, Alvin J. Bordelon, Jr., Donald E. Theriot, Bordelon, Hamlin & Theriot, New Orleans, LA, for Secor Bank SSB.

John C. Combe, Jr., Andrew R. Lee, Jones, Walker, Waechter, Poitevent, Carrere, & Denegre, New Orleans, LA, for Traveler Indem. Co.

Nathan Gisclair, Jr., Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, for U.S. Fidelity and Co.

## ORDER AND REASONS

MENTZ, District Judge.

The Cellas, defendants in this case (Cellas), purchased a tract of land owned by First Financial Bank, later known as Secor Bank, F.S.B. (FFB/Secor), which lent Cellas the purchase price for the property and an additional sum for the construction thereon of the Brandy Place Shopping Center (the shopping center). In conjunction with its loan to the Cellas, FFB/Secor contracted for a twenty-five percent interest in the value of the completed project. The act of sale occurred on October 14, 1983, at which time the Cellas executed a promissory note (the handnote) in the amount of one million nine hundred seventy thousand and no/100 dollars ($1,970,-000), in addition to other documents.

Cellas were sued by the former St. Bernard Federal Savings and Loan Association (St. Bernard), presently the Resolution Trust Corporation (RTC), which purchased an ownership interest in the loan from FFB/Secor and which subsequently seized the rents of the shopping center in June of 1986 upon alleged default of the loan.[1] The note matured without payment September 30, 1986. St. Bernard/RTC initiated these proceedings September 9, 1987, by filing a petition for executory process which was subsequently converted to via ordinaria once the initial sale and seizure was enjoined by Cellas. The ultimate successor of St. Bernard, RTC as conservator and receiver removed the case to federal court pursuant to 12 U.S.C. § 1441a(1).

Cellas have asserted defenses to St. Bernard/RTC's suit on the note and have sued the insurers of St. Bernard and RTC as liquidator, for wrongful seizure of the rents and property. Cellas have also filed a third-party claim against Secor for damages for breach of contract and other claims arising out of the original Purchase Agreement entered into August 1, 1983.

For reasons contained therein by Minute Entry dated June 18, 1993, the Court previously ruled that RTC was not a holder in due course, having taken from St. Bernard to whom the handnote was endorsed more than seven months subsequent to its maturity.

In this latest round of motions for summary judgment, RTC contends that it need not be a holder in due course to collect on the notes. Having before it at this juncture more documents, affidavits, and deposition testimony[2] to shed further light on the transactions at issue, the Court is more receptive to this contention. A more detailed rendition of the facts precedes the reasoning of the Court.

---

1. RTC is seeking repayment of the principal loan balance of $1,970,000.00 plus accrued interest at the rate set forth in the promissory note, less the net proceeds from the collection of rents after expenses from maintenance and management of the shopping center. As of October 12, 1993, accrued interest totaled $1,247,066.12 and continues to accrue at a per diem of $656.67.

2. In particular the construction loan participation agreement, the loan participation agreement, the seller-service agreement, and additional correspondence between St. Bernard and Cellas in the year preceding June 19, 1986.

## I. FACTS

On October 14, 1983, the Cellas obtained a loan from FFB/Secor to acquire property and build a strip shopping center.[3] Contemporaneous with the closing of the loan the Cellas executed five documents pertinent to the issues in dispute.[4]

The Cellas executed a note payable to FFB/Secor in the principal amount of $1,970,000, payable on September 30, 1986 and bearing interest at the rate of 1% above the Citibank, N.A. prime lending rate, adjusted monthly, but in no event at a rate less than 12% per annum. The handnote was secured by the pledge of a collateral mortgage note (CMN) in the principal sum of $2,500,000 of the same date, payable to the order of Bearer, due on demand, with interest at the rate of 20% per annum.

The Cellas also executed a collateral mortgage (CM), paraphed ne varietur and identified with the CMN, in the sum of $2,500,000 which granted the bearer a security interest in the real property and improvements acquired with the proceeds of the loan. The collateral mortgage included a rent assignment provision as additional security, the import and proper execution of which is keenly disputed.

In a collateral pledge agreement (the pledge agreement) the Cellas pledged the CMN and CM and an additional $250,000 second mortgage note on an unrelated tract of real property to secure repayment of the handnote. Cellas subsequently substituted this second mortgage with a $100,000 certificate of deposit (the pledged CD).

FFB/Secor and Cellas also entered a separate loan agreement at the closing, which included a provision allowing the borrower thirty days to cure from receipt of written notice of default.[5] Pursuant to the Lender's Participation article of the loan agreement, the lender was entitled to 25% of the net profits upon sale of the property or refinancing of the loan with another lender.[6]

FFB/Secor sold to Cellas the land upon which the shopping center was to be built adjacent to a FFB/Secor branch office. In order to realize the sizable profits from this sale, two months after the closing FFB/Secor sold a 100% participation in the Cellas loan to St. Bernard on December 22, 1983. The loan participation agreement affecting this arrangement contains first mention of FFB/Secor's sale of the 25% interest in net profits to St. Bernard.[7]

Apparently on December 21st St. Bernard purchased a $1,470,000 undivided interest in the loan which was increased to $1,970,000 or 100%, the next day. Contemporaneously, St. Bernard sold a portion of its then 100% share of the Cella loan to two new participants, Citizens Homestead (Citizens) and Bayou Federal Savings and Loan (Bayou Federal). The purchase from FFB/Secor and the sales to participants Citizens and Bayou Federal were approved by the Board of Directors of St. Bernard.[8]

---

3. Some time after the events here at issue First Financial Bank became known as Secor Bank, F.S.B., the named third-party defendant herein and the undisputed successor by merger of First Financial. Thus the Court will refer to these two entities as FFB/Secor.

4. The August 1, 1983 purchase agreement was nullified by the terms of the FFB/Secor Commitment Letter accepted by Cella September 6, 1983. The commitment letter was ratified by the loan agreement signed at the loan closing on October 14, 1983.

5. Whether St. Bernard violated the notice of default provision of the loan agreement is the subject of one of Cellas two motions for partial summary judgment before the Court.

6. This provision is the foundation for the alleged FFB/Secor/Cellas joint venture.

7. Article XVIX of the Participation Agreement provides: With respect to Items V, Lenders Participation, Articles 1 through 4 of the "Loan Agreement" dated October 14, 1983 between Seller (as Lender) and Borrower (Mr. and Mrs. George Cella III), Seller hereby agrees to consult with Borrower 90 days prior to maturity (September 30, 1986) appropriate terms for payout or refinance. However, any commitment to Borrower is conditioned on the approval of participating Lender ... with the participant at that time entitled to their prorata percentage of the interest incentive under the terms and conditions of the "Loan Agreement."

8. No participation certificates were attached to these agreements and the language transferring FFB/Secor's interest to St. Bernard mirrored that by which St. Bernard sold to Citizens and Bayou Federal.

Although St. Bernard was the beneficial owner of the loan from December 22, 1983, FFB/Secor serviced the loan through the construction period on behalf of St. Bernard.[9] FFB/Secor was the originating or lead lender, but the sale profits it realized by St. Bernard's purchase combined with prior financial dealings with Cellas and the immediate proximity of the shopping center to its offices may have contributed to FFB/Secor's hands-on servicing of a loan in which it had no further beneficial interest.

Cella Development Corporation was the contractor for the shopping center. Upon completion of the construction in December of 1984 and applicable lien periods had run in early 1985, FFB/Secor transferred the servicing of the loan to St. Bernard pursuant to a loan seller-servicer agreement (the seller-servicer agreement).[10] Under the agreement FFB/Secor expressly transferred to St. Bernard all of its rights under the handnote, CMN, and CM as of December 14, 1984, and authorized St. Bernard to service the loan.

By various correspondence from St. Bernard commencing February 14, 1985[11], Cellas were informed that St. Bernard had become the holder of the loan, that it had commenced servicing the loan, that Cellas were required to forward St. Bernard the insurance policies on the property and the notice from the insurance company changing the endorsement in favor of FFB/Secor to one in favor of St. Bernard, and that payment from thenceforth should be made directly to St. Bernard. In the February 14th letter, St. Bernard granted Cellas a fifteen-day (15) grace period within which to pay the loan interest due on the first of the month.[12]

Pursuant to the seller-servicer agreement[13], FFB/Secor delivered physical possession of the handnote, CMN, CM and the pledge agreement to St. Bernard, as evidenced by a receipt dated February 14, 1985. The CMN and the CM were made payable to bearer. The handnote was made payable to the order of FFB, but inadvertently was not endorsed over to St. Bernard at the time of the physical transfer.[14]

9. Article VIII of the Loan Participation Agreement between FFB/Secor and St. Bernard provides: It is agreed that the exclusive right to decide how to service such loans and what to do and how to do it, and when to accelerate ..., when to foreclose or otherwise to acquire the property and the manner thereof, ..., is hereby vested in the Seller. The Buyer shall not be authorized to give directions to the Seller in connection with these matters.

10. Janice Kannair, executive vice president of St. Bernard signed the seller-servicer agreement on December 20, 1984, and Kathryn C. Floyd signed on behalf of FFB/Secor on January 8, 1985. Discovery has revealed no corporate authority for Ms. Floyd to act as mandatory for FFB/Secor and has produced an unsigned original of the seller-service agreement and two different signed copies of this document.

11. By letter dated February 11, 1985, FFB/Secor informed Cellas St. Bernard would be servicing the loan.

12. The provision for the 15 day grace period was reiterated by registered letter from St. Bernard dated April 10, 1985.

13. Pertinent language from the seller-servicer agreement includes: IX. ... Seller, as originating lender, hereby conveys to purchaser all profits, proceeds, and responsibilities hereinto referred to or contained in any documents executed in connection with this lending transaction

dated 10/14/83 or subsequent thereto ... VII ... It is agreed that Setter and Buyer are not partners or joint venturers, and that Seller is not to act as agent for the Buyer, except with respect to its servicing to Buyer until all documents, transmittals, and funds are received by Buyer in connection with the full assignment of Seller's rights in this transaction.

14. It is clear to the Court that upon execution of the seller-service agreement and physical transfer of the handnote, CMN, CM, and the pledge agreement, FFB/Secor no longer had any interest whatsoever. However, the failure to endorse the handnote to St. Bernard prior to maturity of the loan, the very formality which defeated St. Bernard's foreclosure by executory process, is likewise at least one of the failed requirements which prohibited St. Bernard's status as a holder in due course. In both instances, the failure to comply with this formal requirement resulted in allowance of Cellas to plead defenses.

In lieu of an endorsement, formal transfer was ultimately accomplished on May 21, 1987 by Act of Sale of Promissory Note with Assignment of Collateral Mortgage Note and Collateral Mortgage between FFB/Secor and St. Bernard. The document provided the maturity date of the loan was September 30, 1986 and that "said transfer ... by Seller to Purchaser, is made without warranty of any kind by or recourse against Seller." Executed by authentic act before a notary and two witnesses, the act of sale states that a corporate resolution was attached, but none was produced in discovery.

Despite completion of the shopping center and commencement of rental payments, from the time St. Bernard assumed servicing of this loan, Cellas were chronically delinquent in making the interest payments [15] and were noticed of same by St. Bernard. This reflected the extreme down turn in the New Orleans real estate market at that time.

Ultimately, in a February 25, 1986 letter, St. Bernard notified Cellas they were delinquent from October 21, 1985, they owed interest in the amount of $84,756.25 as of March 1, 1986, and as a consequence St. Bernard was exercising its right to an assignment of rents as of March 1, 1986.

In addition, on April 10, 1986, St. Bernard notified Cellas it had advanced $17,216.67 towards payment of the 1985 Jefferson Parish taxes on the shopping center. The Cellas had failed to pay these taxes, which constituted an act of default under the express terms of the CM. At the request of Cellas, on May 20, 1986, St. Bernard withdrew $76,350.72 from the $100,000 pledged CD to pay the interest payments through May 1, 1986 and to reimburse St. Bernard for its payment of the property taxes.

On June 19, 1986, having not received Cellas June 1st interest payment within the 15 day grace period, St. Bernard's president, James Kitto, notified the shopping center tenants that St. Bernard was exercising its right to a rent assignment and that all rents should henceforth be mailed directly to St. Bernard. The crux of this lawsuit involves interpretation of the controlling documents, the correspondence exchanged, and the course of conduct between Cellas and St. Bernard particularly during this crucial time period.

June 15, 1986, was a Sunday. Cellas mailed a check dated June 16, 1986 to St. Bernard, which payment was credited to their account on June 23rd. Cellas never made another payment and failed to repay the loan when it matured September 30, 1986. Cellas unsuccessfully approached St. Bernard and the other participants about refinancing. After loan workout negotiations failed, St. Bernard filed this action to foreclose by executory process on September 9, 1987. St. Bernard subsequently converted the action to ordinary process after the Cellas obtained an injunction blocking the seizure and sale.

As the foreclosing mortgage holder, St. Bernard seized the property and had itself or its agent, Landmark Asset Management Company, appointed as keeper. St. Bernard and Landmark were subsequently substituted by RTC and its agent, Center Management Company.[16]

## II. REASONS

Before the Court are several motions by the parties in this case all of which stem from the preceding factual configuration.

Before addressing the motions however, the Court notes generally that this case is both technical and complicated in nature, involving as it does the construction, import and interplay of numerous documents, not one of which was drafted by Cellas. These documents are sometimes internally and/or externally contradictory, incomplete for want of exhibits or certificates, seemingly ineffectual for lack of an empowering corporate resolution, and distortive due to their contents conflicting with the existing economic reality between the parties.[17]

It is apparent to the Court that as in all litigation the parties suffer the need to pick and choose selective clauses of varying docu-

15. George Cella admitted in deposition testimony that he had received notices from St. Bernard of late payments for six of the last seven months of 1985.

16. The pertinent sequence of events is as follows: St. Bernard converted to a state savings and loan on July 16, 1986, and on May 1, 1988 changed its name to Oak Tree Savings Bank. On October 13, 1991, the Office of Thrift Supervision declared Oak Tree insolvent, appointed RTC as its receiver, chartered Oak Tree Federal Savings and appointed RTC as its conservator. On the same day RTC as conservator acquired the Cellas handnote from RTC as receiver by Purchase and Assumption Agreement. Certain liabilities, including the counterclaim filed by Cellas remained with RTC as Receiver for Oak Tree Savings Bank.

17. For a relatively succinct summary of these deficiencies, see pages 16–28 of the unexecuted (preliminary) Pre–Trial Order.

ments supportive of their positions. The propensity to do so in this case is exacerbated by the bar to any defense derived from a side agreement failing to meet the requirements of 12 USC § 1823, referred to as the D'Oench Duhme doctrine.

■ The facts, documents, and law controlling this case fall outside the purview of D'Oench Duhme. Try as RTC might to hold fast to the handnote, the collateral mortgage note, and the collateral mortgage [18], not one of which was executed by St. Bernard from whom RTC took, RTC nevertheless points to an incomplete loan participation agreement [19] and a subsequently signed loan seller-service agreement [20] to attempt to prove that St. Bernard actually "owned" the note.

This is an obvious attempt to justify the lack of an endorsement of the handnote to St. Bernard and to minimize the import of the May 21, 1987 Act of Sale of Promissory Note with Assignment of Collateral Mortgage Note and Collateral Mortgage between FFB/Secor and St. Bernard. This transaction which occurred after maturity of the note, coupled with the lack of endorsement of the handnote, would likely have given a bank auditor an initial impression of minimal worth.

To address that impression and the question of when RTC became owner of the handnote, if RTC may justifiably cite documents which were not executed contemporaneously with the acquisition of the asset [21], Cellas may cite to those such as the pledge agreement and the loan agreement which were executed contemporaneously as part of the original loan package. Thus, the Court has not barred the pledge agreement, the loan agreement, the loan participation agreement, the construction loan participation agreement, the seller-servicer agreement, or the May 21, 1987 act of sale from its consideration in determining the rights of the parties who executed the agreements. [22]

*Secor's motions for summary judgment*

■ Cellas has alleged a joint venture exists between themselves and FFB/Secor based primarily on the 25% interest to FFB/Secor in the value of the completed project provided for in the loan agreement. Despite there being no evidence of an intent by FFB/Secor to share in Cellas losses, Cellas are seemingly buttressed in their contention by La.C.C. Art. 2804, Participation in one category only, which provides:

> If a partnership agreement establishes the extent of participation by partners in only one category of either profits, commercial benefits, losses, or the distribution of assets other than capital contributions, partners participate to that extent in each category unless the agreement itself or the nature of the participation indicates the partners intended otherwise.

Upon closer scrutiny of the documents and summary judgment evidence before it, the Court has determined it was mistaken in its initial impression that a joint venture exists between FFB/Secor and Cellas. To begin with the *only* indication of such a venture is the 25% interest in the net profits from the property. The potential 25% interest in net profits could justifiably be construed as an incentive for such a highly leveraged loan, but assuming it to be an indicia of a joint venture, that fact alone is overwhelmingly offset by others which demonstrate "the nature of the participation indicates otherwise."

---

**18.** all three of which were executed October 14, 1983, *contemporaneously* with the loan agreement and the pledge agreement.

**19.** executed December 12, 1983, the participation certificates were not attached.

**20.** executed by St. Bernard on December 20, 1984, and by FFB/Secor on January 8, 1985. Thus these three sets of documents were hardly executed contemporaneously "with the acquisition of the asset by the bank."

**21.** In fact the loan participation agreement and the seller-servicer agreement both make refer-

ence to the lenders participation interest incentive which was provided for only in the loan agreement.

**22.** RTC apparently misunderstood the Court's reference to the handnote in its minute entry of June 18, 1993. The handnote in and of itself is not invalid, but the content of the handnote showing it matured on September 30, 1986, (prior to the May 21, 1987 Act of Sale) tended to "diminish the ... interest of the Corporation in any asset (the handnote itself) acquired by it."

According to Cellas, they provided the know-how and expertise in constructing the shopping center and FFB/Secor provided the property and the money need to construct it. Yet FFB/Secor realized an undisclosed profit of over $700,000 on the sale of its property to Cella, hardly a contribution to the venture.

As to sharing in the losses, the loan agreement specifically provides:

> If at any time during the term of the loan, Lender, *in its sole judgment,* determines that the amount necessary to complete the improvements, pay the interest on the loan (pursuant to the provisions of the master hand note), *and meet other costs relating to the loan, exceeds the undistributed portion of the loan (a "Deficiency"), Lender shall have the right at its option to cease advances under the loan until Borrower shall have provided Lender with (i) cash in an amount necessary to meet the Deficiency; (ii) an unconditional and irrevocable letter of credit in an amount sufficient to meet the Deficiency; (iii) or such other security as Lender may agree upon. Emphasis added.*

This demonstrates an utter unwillingness to share in Cellas' losses as does a further provision of the loan agreement:

> In the event that the said project becomes subject to any such unauthorized encumbrance, lien, litigation or order, Lender shall have the right, at its option, to withhold further disbursements until the issues presented are released, settled, compromised or arrangements made to assure the Lender of *no loss* by the execution of appropriate security bonds or other documents satisfactory to Lender. Emphasis added.

As pointed out by Secor and as undisputedly supported by the summary judgment evidence before the Court, Cellas individually, not the alleged joint venture/partnership, signed the handnote, the collateral mortgage, all other loan closing documents, and at all times held record title to the property in their own name.

Cellas individually signed all tenant leases as owner/lessor of the property, collected rents, and selected Latter & Blum to be their leasing agent.[23]

No formal joint venture agreement or partnership agreement was signed between Secor and Cellas, nor was a partnership agreement between them recorded with the Secretary of State, as would be necessary for the alleged partnership to own real property.[24] Cellas were not told by anyone at Secor or St. Bernard that they had the intent to enter into a joint venture or partnership with Cellas.[25]

Cellas own wholly owned corporation constructed the shopping center. Other than standard lender protections provided in a *printed form* construction loan agreement, Cella individually had total control of construction of the project.

Prior to filing their 3rd party pleadings against Secor in *1992,* Cellas never once asked Secor to contribute to their debt service on the handnote or to pay any share of the operating expenses of the project. And lastly, at his deposition George Cella conceded the loan documents contained nothing that indicated FFB/Secor would share losses with him in this project.[26]

As a matter of law, the Court finds there was no joint venture between FFB/Secor and Cellas. *Huffman Technical Drilling, Inc. v. Smith,* 424 So.2d 435, 438 (La.App.1982); *West v. Kerr–McGee Corporation,* 586 F.Supp. 493 (E.D.La.1984); *Riddle v. Simmons,* 589 So.2d 89, 92 (La.App. 2nd Cir. 1991), *writ den.* 592 So.2d 1316 (La.1992).

■ The Court summarily disposes of Cellas asserted cause of action for rescission of the loan. In order for Cellas to seek rescission of the loan transaction, they must, as a condition precedent to rescission, return to FFB/Secor and its successor-in-interest, RTC, the loan proceeds they received under the contract to be rescinded. *United States v. Texarkana Trawlers,* 846 F.2d 297, 304

---

23. Cella deposition, p. 136 & 137.

24. George Cella deposition, p. 97.

25. Cella deposition, p. 141.

26. Cella deposition, p. 131.

(5th Cir.1988). To the Court's knowledge, such a tender has not been forthcoming.

■ A party seeking to rescind a contract for fraud or misrepresentation must seek rescission shortly after discovering the misrepresentation. *Grillet v. Sears Roebuck & Company*, 927 F.2d 217, 221 (5th Cir.1991). Cellas instead retained the loan proceeds for approximately five years after the loan transaction was originally closed. By waiting until their real estate and the mortgage became troubled, Cellas in effect ratified the loan contract through their conduct. *Texarkana Trawlers*, at 305.

■ Addressing the merits of Cellas' affirmative defenses, the Court finds there was no failure or want of consideration for the loan. In his deposition testimony George Cella acknowledged that FFB/Secor funded $1,970,000 to Cellas or on their behalf. Clearly the handnote was given for valuable consideration. *American Bank v. Saxena*, 553 So.2d 836 (La.1989).

On August 1, 1983 FFB/Secor and Cellas signed a purchase agreement providing for a 5 year term and no interest rate floor. More favorable than the terms ultimately entered into, the loan was conditioned on FFB/Secor approving Cella's and the project's credit worthiness. Without seeking Board approval or apparently determining anything negative as to credit worthiness, an FFB/Secor executive nevertheless drafted a commitment letter providing for terms more onerous to Cellas: a 3 year terms and a 12% interest floor.

According to George Cella, upon presentation of the commitment letter containing the revised terms, the executive basically told him to take it or leave it, that FFB/Secor intended to enforce the purchase agreement and would seek redress in court to keep Cellas' deposit. Mr. Cella acknowledged that he signed the commitment letter on September 6, 1983, and that the executive openly discussed the changes from the terms in the August 1 purchase agreement. Cellas basis for the affirmative defense of fraud in the factum is apparently that the executive failed to tell him the changes were not due to an increased credit risk or to disapproval by the Board.

From these facts alleged by Cellas and accepted by the Court as true for the purposes of summary judgment stem Cellas further claims against FFB/Secor for breach of the purchase agreement, breach of an obligation of good faith and fair dealing, a claim for reimbursement of excessive interest collected on the loan, and a cause of action for specific performance.

■ The Court finds there to be no fraud in the factum in the confection of this loan.[27] Cellas admit FFB/Secor did not misrepresent or suppress the new terms from Cellas. The fact that the loan was conditioned upon approval of creditworthiness did not impose on FFB/Secor an affirmative duty to reveal its reasons for changing the terms of the loan or, for that matter, for the executive to have run the terms of the loan before the FFB/Secor's Board.

■ The executive's "take it or leave it" attitude is an instance of the everyday jousting experienced in the business world. This is particularly so with a businessman of the degree of sophistication as George Cella who, from his financial statement, had clearly been through this process several times. Nor was there a breach of an implied covenant of good faith or fair dealings by FFB/Secor. FFB/Secor had no special relationship with Cellas characterized by elements of public interest, adhesion and fiduciary responsibility. *Tominaga v. Shepherd*, 682 F.Supp. 1489, 1498 (C.D.Cal.1988).

■ Furthermore, Louisiana law holds that threats to file suit, that is, resort to legal process to enforce one's rights is not actionable duress, whether or not the threatening party's legal rights are meritorious. *Texas Company v. McDonald*, 228 La. 353, 82 So.2d 37 (1955).

With respect to the excessive interest, breach and specific performance of the August 1, 1983 purchase agreement claims, the

---

27. Cellas failed to plead fraud with particularity as required by F.R.C.P. #9(b). FFB/Secor moved for a more definite statement and Cellas were allowed to amend three times. Having fail to plead fraud with specificity, Cellas may not now do so through its opposition memorandum.

purchase agreement no longer existed by September 6, 1983. Paragraph 18 of the Commitment Letter signed that day by Cellas and later ratified in the loan agreement provides:

> This commitment upon acceptance will nullify and survive the purchase agreement executed between First Financial Bank, F.S.B. and Borrowers on August 1, 1983.

■■■ Under Louisiana law, contracts may be dissolved by the mutual consent of the parties. La.C.C. Art. 1983. *Christ v. Christ,* 251 So.2d 197 (La.App. 2nd 1971). Once a contract is nullified and dissolved, under the law the contract is deemed never to have existed. Cellas having agreed in writing that the purchase agreement was nullified and dissolved, cannot now attempt to enforce its terms or claim damages for its breach. *Faxon v. Hart Corporation,* 393 So.2d 237 (La.App. 1st Cir.1980).

■■■ Lastly and most frivolous is Cellas' claim that St. Bernard serviced the loan on behalf of FFB/Secor, that Secor as principal is solidarily liable for the actions of its agent St. Bernard, and therefore is responsible for damages arising from St. Bernard's alleged illegal seizure of the shopping center rents. By deposition testimony George Cella stated that by December 22, 1983 FFB/Secor had no money invested in the note. Cellas banking expert acknowledged that by December 22, 1983, St. Bernard owned 100% undivided interest in the loan. Given these admissions the Court holds that St. Bernard could not have been agent to a principal which had no stake in the loan.

There being no material facts at issue with respect to the causes of action and affirmative defenses alleged in third party pleadings against Secor, Secor's motion for summary judgment is *GRANTED.* Thus, Secor's motion to strike and Cellas' motion to dismiss are rendered *MOOT.*[28]

*Cellas' motions for summary judgment # 1 and # 2 and RTC's motion for summary judgment regarding dismissal of Cellas' counterclaims and defenses*

As previously ruled, RTC is not a holder in due course of the handnote, and Cellas may raise whatever remaining defenses it may have to payment of the note.[29] Thus, RTC's motions for summary judgment regarding dismissal of Cella's counterclaims and defenses by the doctrine of *D'Oench, Duhme* and 12 U.S.C. § 1823(e) is *DENIED* as is Cella's motion for partial summary judgment # 1 covering notice of default and lack of capacity and # 2 covering illegal seizure of property by executory process and wrongful seizure of rents since no bond was posted.

These motions concern material issues of fact regarding whether St. Bernard/RTC gave Cellas proper notice of default and opportunity to cure; whether correspondence and the course of conduct between St. Bernard/RTC and Cellas altered their agreement[30]; whether Secor and Cellas intended the assignment of rents upon default to be absolute[31]; whether FFB/Secor and/or St. Bernard/RTC's bank records were correct, e.g. whether the correct amount of interest was charged throughout the course of the loan and timely billed to the correct party and address, whether payments were properly recorded, *Bank of Louisiana v. The Yolo Corporation,* 430 So.2d 756 (La.App. 5th Cir. 1983); whether Cellas could have refinanced the loan by the time of its maturity had St. Bernard/RTC not exercised assignment of

---

**28.** The hearing on Cellas motion to dismiss set for Wednesday, June 29, 1994, is **CANCELLED.**

**29.** In its discussion of Secor's motion for summary judgment the Court dispensed with fraud in the factum, duress, want or failure of consideration, rescission, specific performance, breach of the purchase agreement, breach of implied covenant of good faith and fair dealings, reimbursement of excessive interest, joint venture and solidary liability.

**30.** In particular, the 6/3/86 letter from St. Bernard President Kitto to Cellas regarding the tim-

ing of payment on the loan, the import of which is disputed vehemently, and the 6/11/86 Kitto letter to Cellas in which Kitto stated "Permit me to remind you that May's interest was due on 6/1/86. Please send us your check in the amount of $19,809.38 immediately in order to prevent this loan from going default."

**31.** At this juncture the Court reserves ruling on whether the assignment of rents were absolute as a matter of law as there are presently only 4 Louisiana cases construing LSA–RS 9:4401(a).

the rents; whether St. Bernard/RTC exercised assignment of the rents, although it had on numerous occasions not done so in the past upon late payment of Cellas, because of legitimate misgivings about Cellas' ability to make their payments [32] or whether the trier of fact could infer that the default was simply due to Cellas' temporary misunderstanding as to the payment schedule, and St. Bernard/Rtc was nevertheless requiring strict compliance to create an excuse to exercise assignment of the rents. *See Texas Refrigeration Supply, Inc. v. F.D.I.C.* 953 F.2d 975 (5th Cir.1992).

*The RTC's motion for summary judgment regarding the liability of the Cellas on the debt represented by the handnote or the validity and existence of the collateral mortgage*

■ The Court to date has exercised extreme self restraint in not granting RTC's motion for summary judgment regarding the liability of the Cellas on the debt represented by the handnote and the validity and existence of the collateral mortgage. The Court has done so in an effort to dampen what it perceived as the bully tactics of St. Bernard/RTC in the events occurring during June of 1986, the commencement of executory process in September of 1987, and the repeated thrashing of the D'Oench Duhme doctrine before the Court as if by so doing it could force a square into a round hole.

However, by ruling upon such defenses as fraud in the factum and duress, the Court has whittled away at any remaining colorable arguments as to the correct form and content of the handnote and the collateral mortgage, thereby making it more difficult to refrain from granting RTC's motion.

The Court has earlier noted the inconsistencies and generally sloppy drafting of the documents involved, which Cellas properly have gone over in excruciating detail. As thorough as their analysis has been, it nevertheless fails to overcome one inescapable and controlling fact: Cellas borrowed the money and hasn't paid it back. Unfortunately, what

we have here is a good deal that went bad, along with a considerable part of the New Orleans real estate market in the mid 80's. And no matter how hard Cellas might attempt to point out the conflicts and inconsistencies and attempt to reconstruct the rights and relationships between the parties to this lawsuit, it is apparent to the Court that it is Cellas who will bear the economic loss of their imprudent investment.

There being no material facts at issue as to the liability of the Cellas on the debt represented by the handnote and the validity and existence of the collateral mortgage, RTC's motion for summary judgment as to same is **GRANTED.**

### The Insurance Companies

The Court is mindful of the less than flush financial attributes of the RTC as receiver. Therefore, in an effort to determine the existence of how deep a pocket exists elsewhere, the Court shall address the motions filed by the various insurance companies involved herein, third-party defendants United States Fidelity & Guaranty (USF & G), Travelers Insurance Company (Travelers), and Fidelity and Deposit Company of Maryland (F & D). However, Travelers motion for summary judgment and F & D's adoption of USF & G's motion for summary judgment as to prescription shall be addressed in an amendment to this opinion.

*USF & G's motion for summary judgment*

■ With respect to USF & G's motion for summary judgment on the claims of the Cellas, the Court *DISMISSES* all claims against USF & G for the following reasons. USF & G provided a general liability policy to Landmark Land Company and its subsidiaries, among whom was Dixie Savings & Loan Association (Dixie), for the period December 10, 1985 to December 9, 1986.[33] Dixie acquired St. Bernard during this policy period on August 1, 1986. Prior to its acquisition by Dixie, St. Bernard operated as a separate and independent entity and was nei-

---

**32.** despite St. Bernard's possession of the remaining balance of Cellas' certificate of deposit and St. Bernard's prior willingness to deduct from it

**33.** at which time Travelers Insurance Company picked up coverage.

ther a subsidiary nor an affiliate of Landmark Land Company.

In connection with St. Bernard's independent operation prior to its acquisition by Dixie, St. Bernard obtained and had in full force and effect a special multi-peril policy, including general liability coverage, issued by recently named third-party defendant F & D. F & D's policy covered the period from April 8, 1984, to April 9, 1987, and specifically provided coverage to St. Bernard for bodily injury and property damage.

USF & G's policy with Landmark Land Company provided in pertinent part that a newly acquired entity would become an additional named insured under the USF & G policy, for a ninety day period, if that entity had no other general liability insurance. Since St. Bernard undisputedly[34] had such general liability insurance in force with F & D on the date of acquisition and for over eight months thereafter, St. Bernard never became an insured under the USF & G policy, no insurance coverage was afforded to St. Bernard or its employees, and USF & G has no duty to defend them. As a consequence, the claims of Cellas and St. Bernard employee James Kitto against USF & G are **DISMISSED,** each party to bear its own costs.

*Kitto's motion for summary judgment*

The Court **GRANTS** Kitto's motion for summary judgment on Cella's third party demand. The Court finds there in no evidence of a contractual relationship between Kitto and Cella. Any claims which lay against Kitto are based solely in tort.

 In his capacity as President of St. Bernard, Kitto exercised St. Bernard's rent assignment by letter dated June 19, 1986. It is from this event that a substantial amount of Cella's alleged damages flow. This lawsuit commenced in state court on September 10, 1987, with St. Bernard's filing of a Petition for Executory Process. It was not until July 16, 1992 that Cella for the first time named Kitto as a third party defendant in an amended third party complaint once the lawsuit was removed by RTC to federal court.

The Court finds there to be sufficient justification for Kitto's actions due to Cella's payment history and St. Bernard's commitments to its subparticipants in the loan, as evidenced by Kitto's correspondence with Cella and the subparticipants. The Court specifically finds the actions of Kitto did not give rise to a cause of action based on intentional tortious interference with a contract as a matter of law. *9 to 5 Fashions, Inc. v. Spurney,* 538 So.2d 228 (La.1989). Furthermore, the Court finds, sua sponte, that all allegedly tortious actions taken by Kitto during his employment at St. Bernard regarding the Cella loan were undertaken within the scope of his employment and in his capacity as President of St. Bernard, which position he resigned July 31, 1986. *Canter v. Koehring Company,* 283 So.2d 716 (La.1973). Kitto's motion for summary judgment is **GRANTED** dismissing Cella's third-party complaint against him and all causes of action asserted therein, Cellas to bear all costs. Traveler's motion for summary judgment against Kitto is **MOOT.** Accordingly,

**IT IS ORDERED THAT**

1. Secor's motion for summary judgment is **GRANTED,**

2. Secor's motion to strike and Cella's motion to dismiss are rendered **MOOT** and the hearing on Cellas motion to dismiss set for Wednesday, June 29, 1994, is **CANCELLED.**

3. RTC's motion for summary judgment regarding dismissal of Cella's counterclaims and defenses by the doctrine of *D'Oench, Duhme* and 12 U.S.C. § 1823(e) is **DENIED.**

4. Cella's motions for partial summary judgment # 1 covering notice of default and lack of capacity and # 2 covering illegal seizure of property by executory process and wrongful seizure of rents since no bond was posted is **DENIED.**

---

**34.** The Court notes that USF & G's supplemental memorandum in support of its motions for summary judgment setting forth the above facts was filed on March 25, 1994. Uncharacteristically, Cella has not filed a motion for leave to respond.

5. RTC's motion for summary judgment as to the liability of the Cellas on the debt represented by the handnote and the validity and existence of the collateral mortgage is *GRANTED.*

6. The claims of Cellas and Kitto against USF & G are *DISMISSED.*

7. Kitto's motion for summary judgment on Cellas' third party demand is *GRANTED.* Travelers' motion for summary judgment against Kitto is rendered *MOOT.*