PELLERIN CONSTRUCTION, INC.

v.

WITCO CORPORATION and
Fluor Enterprises, Inc.
f/k/a Fluor Daniel

No. Civ.A. 00–0465.

United States District Court,
E.D. Louisiana.

April 11, 2001.

John A. Stewart, Jr., Hulse & Wanek, Lloyd Noble Shields, Daniel Lund, III, Mark S. Senter, Stuart Glen Richeson, Shields Mott Lund, LLP, New Orleans, LA, for Plaintiff.

Dominic Joseph Gianna, John Dennis Person, Michele A. Engnath, Middleberg, Riddle & Gianna, Sherman Gene Fendler, Shannon Skelton Holtzman, Carol Welborn Reisman, Kenneth Todd Wallace, Liskow & Lewis, Sarah Ann Lowman, Helen Wynne Eikel, Middleberg, Riddle & Gianna, New Orleans, LA, for Defendants.

Hibernia National Bank c/o Brion Workman, New Orleans, LA, for Garnishee.

### ORDER AND REASONS

VANCE, District Judge.

Before the Court are two motions for summary judgment by defendant Witco Corporation and defendant Fluor Daniel, Inc. to dismiss plaintiff's claims. On March 23, 2001, the Court entertained the parties' oral arguments on these motions. For the following reasons, the Court grants defendants' motions for summary judgment.

### I. Background

In 1996, defendant Witco Corporation, a manufacturer of specialty chemicals, embarked upon a program to close fifteen of its facilities and to expand and modernize thirty others. To carry out this program, Witco contracted with defendant Fluor Daniel, Inc. in 1997 to provide engineering, procurement, and construction management services and to perform certain por-

tions of the construction, including structural steel erection. Witco also appointed Fluor Daniel "as its Agent to issue contracts and to procure materials and equipment in the name of and on behalf of WITCO." (Fluor Daniel's Mem. Supp. Mot. Summ. J., Ex. B at 10, Ex. C at 3.) Under the original terms of this agreement, Witco compensated Fluor Daniel on a cost reimbursable/performance fee basis, but in the fall of 1998 the parties changed the compensation to a lump sum. (*Id.*, Ex. B at 2; Pl.'s Mem. Opp'n Defs.' Mots. Summ. J., Ex. L.)

One of the projects on which Fluor Daniel was engaged was the relocation and upgrade of a Witco processing plant from a forty-year-old facility in Brooklyn, New York to Taft, Louisiana. This relocation involved the erection of two structures in Louisiana: a liquids processing building and a solids processing building. It also involved the erection of a raw material storage area, a finished product storage area, and an interconnecting pipe rack.

Witco published a request for proposals in which it solicited bids for the mechanical services component of this project, and plaintiff Pellerin Construction, Inc. responded with a bid to perform those services. In preparing its bid, Pellerin had access to the draft contract, forms for bids, specifications, description of work, and drawings, as well as certain other information that it requested. (Witco's Mem. Supp. Mot. Summ. J., Ex. D at 113, Ex. I at 30–33, 189–92.) It also attended a bid clarification meeting. (Fluor Daniel's Reply Mem. Supp. Mot. Summ. J., Ex. I at 117–19.) After reviewing the bids, Witco awarded the contract to Pellerin.

Fluor Daniel, acting as Witco's agent, then entered into an eight hundred page contract with Pellerin to provide mechanical services on the project for a lump sum price of $4,145,000.00. The parties antici-

pated that Pellerin would substantially complete its work by December 31, 1998, although the parties foresaw that some equipment would not be delivered for installation until January and February 1999. (Defs.' Joint Resp. Pl.'s Post–Hr'g Submission, Ex. A at 2.) Pellerin's services included the installation of equipment supplied by Fluor Daniel or Witco, preparation of piping isometric drawings, pipe fabrication, and the installation of piping in the liquids building, the solids building, and the pipe rack. (Def. Fluor Daniel's Mem. Supp. Mot. Summ. J., Ex. A; Pl.'s Mem. Opp'n Defs.' Joint Mot. Strike, Ex. A [hereinafter "Contract"], Part I.) Although the effective date of the contract was August 7, 1998, Pellerin did not sign the contract until October 15, 1998. (Contract at 2.) The terms of the contract are governed by Louisiana law. *See* LA.REV. STAT. § 9:2779.

The contract anticipated various construction difficulties and incorporated provisions addressing incomplete engineering drawings, the sequence and scheduling of work, crowded work conditions, delays, late delivery of equipment and materials, and changes in the scope of work. Specifically, Part I, articles 1.1 and 3.3.12 and Part III, article 5.1 acknowledge the incomplete project engineering. Article 1.1 requires Pellerin to verify the routing of piping plan layouts because "the location of equipment, structural steel, piping and electrical installations ... may or may not be shown on drawings provided by [Fluor Daniel]." Article 3.3.12 states: "Several of the listed drawings are drawings of existing equipment that are being relocated from the Brooklyn N.Y. facility to the new facility at Taft. Some of these drawings are two decades old and are not totally readable." Article 5.1 notes that "[t]he specifications and drawings may not be complete in every detail." Notwithstanding this in-

complete engineering, Pellerin represents in Part III, article 3.0 that regardless of any negligence by Fluor Daniel or Witco, it will perform the work for the contract price without recourse to Fluor Daniel or Witco:

> [Pellerin] has carefully examined the drawings and specifications for the Work and has fully acquainted itself with all other conditions relevant to the Work, and its surroundings, and [Pellerin] assumes the risk of such conditions and will, regardless of such conditions, the expense, difficulty of performing the Work, or negligence, if any, of [Fluor Daniel] or [Witco], fully complete the Work for the stated Contract Price without further recourse to [Fluor Daniel] or [Witco]. Information on the site of the Work and local conditions at the site furnished by [Fluor Daniel] or [Witco] in specifications, drawings or otherwise is not guaranteed by [Fluor Daniel] or [Witco] and is furnished only for the convenience of [Pellerin].

In Part III, articles 10.1, 10.2, and 10.3, the parties give defendants the right to coordinate and schedule the work to meet the needs of the overall project schedule:

> 10.1 [Fluor Daniel] shall schedule and coordinate the details of the Work being performed to meet the schedule requirements set forth in PART I of this Contract. . . .
>
> 10.2 . . . In the event [Pellerin's] performance of the Work is not in compliance with the schedule established for such performance, [Fluor Daniel] may, in writing, require the Contractor to submit its plan for schedule recovery, or specify in writing the steps to be taken to achieve compliance with such schedule, and/or exercise any other remedies under this Contract. [Pellerin] shall thereupon take such steps as may be directed by [Fluor Daniel] or otherwise

necessary to improve its progress without additional cost to [Fluor Daniel] or [Witco].

10.3 [Pellerin] recognizes that [Fluor Daniel], [Witco], other contractors and subcontractors may be working concurrently at the jobsite. [Pellerin] agrees to cooperate with [Fluor Daniel], [Witco] and other contractors so that the project as a whole will progress with a minimum of delays. [Fluor Daniel] and [Witco] reserve the right to direct [Pellerin] to schedule the order of performance of its Work in such a manner as not to interfere with the performance of others.

Part I, article 12.2 further emphasizes that Pellerin will have to work in an operating plant and that it agrees to allow for interruptions in its work as required by other contractors or operating plant personnel to benefit project progress or continuing operations of the existing plant:

> Contractor is advised that this work will be performed adjacent to and/or in an operating plant with other Contractors present. Contractor shall cooperate with the operating plant and other Contractors and allow for occasional interruptions in the work, required either by other Contractors or operating plant personnel, so as to benefit the overall progress of the project or to ensure the safe and continuing operations of the existing plant.

In addition, under Part I, article 3.6.10, the parties agree that delays due to congestion at the worksite will not be a basis for claims by Pellerin:

> Considerable congestion will exist in many areas of the job, and must be allowed for in planning of work activities. Others may be performing work in the immediate area of the jobsite which shall require coordination to limit delays in performing work. Extent of congestion is not intended to be represented in

drawings. Delays due to congestion shall not be a basis for claims by [Pellerin].

Two other provisions also address delays—Part I, article 3.3.1 and Part III, article 12.3. Article 3.3.1 states that late deliveries of some equipment will "inevitably" occur and that Pellerin's installation plans will be "flexible" in dealing with this situation:

> [Pellerin] shall maintain a flexible plan of equipment installation since some of the equipment will inevitably arrive in the field later than the target delivery dates. [Fluor Daniel] will maintain and issue a current delivery list and will notify [Pellerin] as soon as possible of the expected delivery dates of the equipment.

In article 12.3, Pellerin waives damages for delay: "[Pellerin] shall not be entitled to, and hereby expressly waives recovery of, any damages suffered by reason of delays of any nature, and extension of time shall constitute the sole liability of [Fluor Daniel] and [Witco] and [Pellerin's] sole remedy for delays."

The contract also provides that the "Scope of Work shall be subject to change by additions, deletions or revisions thereto by [Fluor Daniel]." (Contract, Part III, art. 15.1.) The remainder of article 15 provides for additional compensation for changes in the scope of the work and a methodology for effecting written changes. (*See id.*, Part III, arts. 15.2–15.5.)

As work progressed, the parties encountered many of the construction difficulties anticipated in the contract. For example, Pellerin faced difficulties with the drawings, bad weather, and crowded work conditions. Further, Fluor Daniel sequenced Pellerin's work so that Pellerin had to complete the solids building before beginning the liquids building, instead of working on the two buildings in tandem as Pellerin had proposed. Structural steel was erected late, and there were changes to the scope of Pellerin's work. All of these events delayed the project. As a consequence of these delays, Pellerin did not substantially complete its contractual obligations and demobilize until June 15, 1999. These delays, among other reasons, prompted the parties to enter into twenty-one contract modifications between November 16, 1998 and June 28, 1999, which extended the completion date and increased Pellerin's lump-sum compensation from \$4,145,000.00 to \$5,295,351.00. (*Id.*, Part II, art. 1.1; Witco's Mem. Supp. Mot. Summ. J., Ex. A at Contract Modifications Nos. 1–21.) When the parties agreed on each contract modification, they included the following language releasing any prior, unpreserved claims, including claims for delays or disruptions that occurred prior to the modification:

> THIS CONTRACT MODIFICATION REPRESENTS FINAL ADJUSTMENT FOR ANY AND ALL AMOUNTS DUE OR TO BECOME DUE TO [PELLERIN] FOR CHANGES REFERRED TO HEREIN. [PELLERIN] FURTHER RELEASES ALL OTHER CLAIMS, IF ANY (EXCEPT THOSE CLAIMS PREVIOUSLY SUBMITTED IN WRITING IN STRICT ACCORDANCE WITH THE CONTRACT), FOR ADDITIONAL COMPENSATION UNDER THIS CONTRACT, INCLUDING WITHOUT LIMITATION ANY RIGHTS CONTRACTOR MAY HAVE FOR ADDITIONAL COMPENSATION ARISING OUT OF DELAYS OR DISRUPTION OF CONTRACTOR'S SCHEDULE AS MAY HAVE ARISEN PRIOR TO THE DATE OF THIS MODIFICATION.

(Witco's Mem. Supp. Mot. Summ. J., Ex. A at Contract Modification Nos. 1–21.)

On December 11, 1998 and January 19, 1999, Pellerin signed the first two contract modifications, which dealt with limited changes in the scope of the work. When the December 31, 1998 substantial completion date had not been achieved, the parties negotiated the third contract modification during January and February 1999. By this time, Pellerin's problems with delays resulting from difficulties with the drawings, late steel erection, Fluor Daniel's sequencing of Pellerin's work on the solids building and the liquids building, crowded work conditions, and changes in the scope of its work were all on the table. (Defs.' Joint Resp. Pl.'s Post–Hr'g Submission, Ex. A at 2; Witco's Mem. Supp. Mot. Summ. J., Ex. E at 310.)

Pellerin and Fluor Daniel, as Witco's agent, signed the third contract modification on March 8, 1999. Pellerin accepted $307,966.00 as "full and final compensation ... for all changes to the contract scope up to [February 22, 1999]" and received an extension of the date for substantial completion of the mechanical work to April 25, 1999. (Witco's Mem. Supp. Mot. Summ. J., Ex. A at Contract Modification No. 3 at 2.) The modification also set up special incentive bonuses, under which Pellerin would be paid additional sums for meeting certain performance targets. Three of the five new bonuses (schedule bonus to labor, early systems completion bonus to Pellerin, and contract completion bonus to Pellerin) included clauses extending bonus eligibility if the bonus target date could not be achieved "due to late delivery by Fluor Daniel of equipment or due to changes instructed by Fluor Daniel." (Id., Ex. A at Contract Modification No. 3 at 3.)

Contract Modification No. 3 also adopted a more favorable payment system for Pellerin. Under the original contract, Fluor Daniel had thirty days to pay Pellerin upon receipt of an invoice. The modifi-cation changed the contract payment terms so that Pellerin would submit invoices bi-weekly, and Fluor Daniel would wire transfer invoice payments within five working days of receipt of the invoice. (Id., Ex. A at Contract Modification No. 3 at 4.) In addition, Fluor Daniel waived withholding the ten percent retainage. (Id., Ex. A at Contract Modification No. 3 at 4.)

The parties agreed that there would be "no future change to the Contract price, except in the event of the following occurrences after February 22, 1999": (1) physical rework to work already installed due to changes by Fluor Daniel to the drawings and specifications, (2) back-charges by Fluor Daniel for specific acts or omissions of Pellerin occurring after February 22, 1999, (3) unavoidable additional costs arising as a direct result of late delivery of Fluor Daniel deliverables, (4) contract site instructions issued by Fluor Daniel not incorporated into Contract Modification Nos. 1–3, and (5) the addition of earned bonuses. (Id., Ex. A at Contract Modification No. 3 at 2.) The parties further agreed:

> Except as specifically stated herein, and in consideration of the increase in Contract Price ..., the bonuses ... and other concessions to the contract terms and conditions set forth herein, [Pellerin] waives any past, present or future entitlement to any change to the Contract. [Pellerin] further waives any right to claim, under Contract or in law, for any change or addition to the Contract price except as set forth in this Article 3 [which establishes five bonuses].

(Id., Ex. A at Contract Modification No. 3 at 2.) In addition, the modification contained the previously quoted release of all other claims, which included claims for delays or disruptions that arose prior to

the date of the modification. *(Id.,* Ex. A at Contract Modification No. 3 at 1.)

Subsequent contract modifications revised and expanded upon the provisions of Contract Modification No. 3. In the fifth contract modification, dated March 13, 1999, the parties clarified and quantified the five bonuses. *(Id.,* Ex. A at Contract Modification No. 5 at 2–3.) In the fourteenth contract modification, signed and dated June 9, 1999, the parties substituted a recognition award for the craft workforce for the third bonus. *(Id.,* Ex. A at Contract Modification No. 14 at 2.) The seventeenth contract modification, dated June 11, 1999, revised the craft workforce recognition award and the four remaining bonuses. *(Id.,* Ex. A at Contract Modification No. 17 at 2–3.) In Contract Modification No. 19, signed and dated June 17, 1999, the parties revised the April 25, 1999 mechanical services substantial completion date to June 1999 and awarded Pellerin the $75,000 contract completion bonus. *(Id.,* Ex. A at Contract Modification No. 19 at 2.) The twentieth contract modification, dated June 24, 1999, noted: "Work is complete, Pellerin has moved off site." *(Id.,* Ex. A at Contract Modification No. 20 at 2.) Fluor Daniel paid Pellerin all of the bonuses established in Contract Modification No. 3. (Fluor Daniel's Mem. Supp. Mot. Summ. J., Ex. L at 339, Ex. M at 185–91, 198–99; Defs.' Joint Resp. Pl.'s Post–Hr'g Submission, Ex. A at 3.)

Eight months after moving off site, on February 11, 2000, Pellerin filed suit against Witco and Fluor Daniel. It amended its complaint on June 22, 2000. In its amended complaint, Pellerin alleges that Witco and Fluor Daniel actively interfered in the project, breached the contract, were grossly negligent, and effected a cardinal change to the contract, causing Pellerin to incur additional expenses for which it is entitled to compensation. Specifically,

Pellerin alleges (1) that defendants drastically revised the sequence and schedule of work, (2) that Fluor Daniel's late and incomplete engineering delayed the project, (3) that defendants' late and disorderly delivery of equipment substantially interfered with and delayed Pellerin's work, (4) that Pellerin's crews were forced to work in congested areas, (5) that defendants' late payments between September 1998 and February 1999 caused Pellerin financial hardship, and (6) that Fluor Daniel withheld Pellerin's earned retainage funds for the solids handling process systems. Pellerin also contends that it was forced to sign the third contract modification under economic duress and that it signed the modification relying on Fluor Daniel's deceptive assurances of certain timely equipment deliveries. Pellerin further alleges that it would not have entered into the contract with Witco, or would have done so at a much higher price, had it known that the contractual relationship between Witco and Fluor Daniel would change and relegate Pellerin to the role of subcontractor. As damages, Pellerin seeks to recover financing costs, indirect field costs, extended home office overhead expenses, expenses for additional labor and equipment, lost profits, and interest on late payments. Alternatively, Pellerin asserts in its amended complaint that it is entitled to recover in quantum meruit for the additional work that it performed and for the additional costs that it incurred.

Defendants now move for summary judgment. Fluor Daniel argues that as Witco's agent it is not liable for Pellerin's damages. Both Witco and Fluor Daniel argue that Louisiana law and the terms of the contract preclude all of Pellerin's claims and that, given the existence of a valid contract, Pellerin cannot recover in quantum meruit.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Accordingly, a court must be satisfied that no reasonable trier of fact could find for the nonmoving party. In other words, "if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden." *Beck v. Texas State Bd. of Dental Exam'rs,* 204 F.3d 629, 633 (5th Cir.2000).

Initially, the moving party bears the burden of establishing that there are no genuine issues of material fact. If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324, 106 S.Ct. at 2553. *See also Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.1994). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential on which it bears the burden of proof at trial. *See Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325, 106 S.Ct. at 2553–54; *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 505 (5th Cir.1999).

■ The Fifth Circuit has "arguably articulated an even more lenient standard for summary judgment in certain nonjury cases." *Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 273 n. 15 (5th Cir.1987). In *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1123 (5th Cir.1978), the Fifth Circuit explained:

> There is no litmus test that infallibly distinguishes those issues that are "factual" from those that are "legal" or "mixed." ... [A]s we approach the point where facts and the application of legal rule to them blend, appraising evidentiary facts in terms of their legal consequences and "applying" law to fact become inseparable processes.

Therefore, in a nonjury case, such as this one, the Court is encouraged to draw inferences, even when they appear to be factual, if a "trial on the merits would reveal no additional data." *Id.* at 1124.

### B. Release of Claims

Defendants argue that Pellerin released all of its claims arising before February 22, 1999 in Contract Modification No. 3. They further argue that any of Pellerin's subsequent claims are precluded by the releases that Pellerin signed in the subsequent contract modifications, which extended beyond the mechanical completion date. The Court will address these arguments in turn.

#### 1. Contract Modification No. 3

Defendants argue that the release and waiver in Contract Modification No. 3 preclude Pellerin's claims arising before February 22, 1999. Like the contract itself, this contract modification has "the effect of law for the parties" and is subject to the Louisiana rules governing contracts. *Id.* art.1983.

### a. Principles of Contract Interpretation for Releases

■ Under Louisiana law, interpretation of a contract is the determination of the common intent of the parties. LA. CIV.CODE art.2045. The Court must interpret each provision in light of the other provisions so that each is given the meaning suggested by the contract as a whole. *Id.* art.2050. The issue whether a contract is ambiguous is a question of law. *See Slocum–Stevens Ins. Agency v. International Risk Consultants, Inc.,* 666 So.2d 352, 357 (La.App. 2d Cir.1995) (citing cases). When the words of a contract are clear and unambiguous and lead to no absurd consequences, the Court will discern the contract's meaning and the parties intent within the four corners of the document. LA. CIV.CODE arts. 1848, 2046. *See also American Totalisator Co. v. Fair Grounds Corp.,* 3 F.3d 810, 813 (5th Cir. 1993); *Barrera v. Ciolino,* 636 So.2d 218, 223–24 (La.1994). A doubtful provision, however, "must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." LA. CIV.CODE art.2053. *See also id.* arts.2048, 2049.

■ In addition to these standard principles of contract interpretation, the scope of a release is governed by article 3073 of the Louisiana Civil Code. *See Coleman v. Robinson,* 778 So.2d 1105, 1118 (E.D.La. 2001); *Gaubert v. Toyota Motor Sales U.S.A., Inc.,* 770 So.2d 879, 881 (La.App. 1st Cir.2000). Under article 3073, a waiver only releases those differences that appear to be comprehended in them by the parties' intention, "unless it be the necessary consequence of what is expressed." *Ingram Corp. v. J. Ray McDermott & Co.,* 698 F.2d 1295, 1321 (5th Cir.1983) (quoting LA. CIV.CODE art. 3073). *See also Amer-ica's Favorite Chicken Co. v. Suryoutomo,* 889 F.Supp. 916, 918 (E.D.La.1995) ("Unambiguous releases of past, present or future known or unknown claims bar those claims.").

### b. The Provisions of Contract Modification No. 3

In the course of this project, many of the construction difficulties anticipated in the contract arose. As the parties briefed and explained at oral argument, by January 1999 (after the project was supposed to have been substantially complete), Pellerin had encountered all of the difficulties giving rise to this case—difficulties with the drawings, late steel erection, resequencing of Pellerin's work, bad weather, crowded work conditions, and changes to the scope of Pellerin's work. Seeking additional compensation for the costs it incurred from the delays caused by these construction difficulties, Pellerin entered into negotiations with Fluor Daniel throughout January and February 1999. The product of these negotiations was Contract Modification No. 3, which Pellerin and Fluor Daniel, acting as Witco's agent, signed on March 8, 1999.

Under the terms of this contract modification, Pellerin accepted $307,966.00 as "full and final compensation ... for all changes to the contract scope up to [February 22, 1999]." (Witco's Mem. Supp. Mot. Summ. J., Ex. A at Contract Modification No. 3 at 2.) The modification gave Pellerin additional time to perform, extending the date for substantial completion to April 25, 1999. It also set up several incentive bonuses, under which Pellerin would be paid additional sums for meeting certain performance targets. Three of the bonuses included clauses extending bonus eligibility if the bonus target date could not be achieved "due to late delivery by Fluor Daniel of equipment or due to

changes instructed by Fluor Daniel." (*Id.*, Ex. A at Contract Modification No. 3 at 3.)

The parties also agreed that there would be "no future change to the Contract price," except in the event of five enumerated occurrences, one of which was late deliveries by Fluor Daniel. (*Id.*, Ex. A at Contract Modification No. 3 at 2.) Further, Pellerin agreed that in exchange for the price increase, bonuses, and other concessions, it "waives any past, present or future entitlement to any change to the Contract [and] further waives any right to claim, under Contract or in law, for any change or addition to the Contract price...." (*Id.*, Ex. A at Contract Modification No. 3 at 2.) Just as explicitly, Pellerin released "all other claims, if any," for additional compensation, including any claims for delay or disruption of work arising before the adoption of this modification.

### c. The Terms Are Binding

■ The terms of this contract modification are clear and unambiguous. Effective February 22, 1999, subject to five specific conditions, Pellerin waived any past, present, or future right to contract changes, and any right to claim, under the contract or in law, for any change or addition to the contract price, except the five delineated bonuses. In addition, Pellerin agreed to release all other unpreserved claims for delays or disruptions occurring prior to the modification. Accordingly, Pellerin released any contract claim arising prior to the date of Contract Modification No. 3.

Pellerin does not challenge the clarity or import of the release and waiver language. Instead, it seeks to avoid the consequences of the third contract modification by arguing that economic duress and Fluor Daniel's fraudulent inducement vitiated its consent.

### (i) Economic Duress

■ Under Louisiana law, duress is sufficient to vitiate a party's consent when it is of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation. *See* LA. CIV.CODE arts.1927, 1959. It results when "a person makes an improper threat that induces a party who has no reasonable alternative to manifest his assent. The result of this type of duress is that the contract that is created is voidable by the victim." *Wolf v. Louisiana State Racing Comm'n,* 545 So.2d 976, 980 (La. 1989) (quoting LA. CIV.CODE art.1959 cmt. b). The mere stress of business conditions, however, does not constitute economic duress if the opposing party did not engage in conduct designed to produce that stress. *See Utley–James of La., Inc. v. Louisiana Dept. of Facility Planning & Control,* 593 So.2d 1261, 1268 (La.App. 1st Cir.1991); *Averette v. Indus. Concepts, Inc.,* 673 So.2d 642, 644 (La.App. 1st Cir. 1996). *See also Aubert v. Entergy Corp.,* 762 So.2d 288, 291 (La.App. 5th Cir.2000) ("claim of financial straits does not constitute duress"); *Hoover v. Boucvalt,* 747 So.2d 1227, 1231 (La.App. 4th Cir.1999) (same).

Pellerin claims that it signed Contract Modification No. 3 under economic duress because the project delays had caused it to incur almost $1 million in additional costs, it was running a $1 million operating deficit on the project (Pl.'s Mem. Opp'n Defs.' Mots. Summ. J. at 38, Ex. A at Ex. 5 at 2),[1] and Fluor Daniel had made only one payment to Pellerin since January 17,

---

**1.** Although Pellerin notes that its overall corporate operating deficit at the end of February 1999 was $2.1 million, the only arguably relevant figure is the deficit on this project. (Pl.'s Mem. Opp'n Defs.' Mots. Summ. J., Ex. P at 2.)

1999. While Pellerin may have been in financial straits, the Court rejects its claim of economic duress.

There are no allegations that defendants improperly threatened Pellerin. Further, Pellerin assumed the financial risk of delays in Part III, article 12.3 of the contract when it agreed that its only remedy for delays would be additional time to perform. Accordingly, in the absence of evidence that defendants caused delays to put Pellerin in extremis, so that they could thereafter make unjustified demands on Pellerin, there is no duress. The record, however, contains no evidence of such conduct by defendants. Indeed, the suggestion that defendants purposefully delayed the project to produce Pellerin's financial straits is nonsensical given defendants' economic interests in completing the project expeditiously. Finally, Pellerin's claim in its brief that Fluor Daniel withheld payments during the negotiations of Contract Modification No. 3 is belied by the undisputed evidence. Pellerin neglects to point out that its records show that Fluor Daniel paid Pellerin $708,031.80 on January 6, 1999. (Pl.'s Mem. Opp'n Defs.' Mots. Summ. J., Ex. A at Ex. N, Ex. R at 1.) Further, Pellerin's records reflect payment of $156,195.90 on January 20, 1999 and $328,570.20 by March 3, 1999. (*Id.*, Ex. A at Ex. N, Ex. R at 1.) That Pellerin received substantial payments of approximately $1.2 million while the third contract modification was being negotiated belies Pellerin's assertion that Fluor Daniel wrongfully suspended further payments until Pellerin signed the modification. While there is undoubtedly some relationship between Pellerin's financial condition and the project delays, defendants did not engage in conduct designed to produce Pellerin's economic problems, and the mere stress of Pellerin's business conditions does not constitute economic duress.

### (ii) Fraud

■ Pellerin also argues that the Court should vitiate its consent to Contract Modification No. 3 because Fluor Daniel fraudulently induced it to sign the modification. Pellerin alleges that Fluor Daniel fraudulently misrepresented that all of the equipment would be delivered in time to achieve the April 25, 1999 milestone completion date when it knew that some of the equipment would not be delivered until May.

■ Under Louisiana law, "[f]raud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." LA. CIV.CODE art.1953. *See also Concise Oil & Gas Partnership v. Louisiana Intrastate Gas Corp.*, 986 F.2d 1463, 1468 (5th Cir.1993). To prove fraud, a party must show an intent to defraud and actual or potential loss or damages. *See Williamson v. Haynes Best W. of Alexandria*, 688 So.2d 1201, 1239 (La.App. 4th Cir.1997). The Court finds that Pellerin fails to point to any evidence, direct or circumstantial, of Fluor Daniel's intent to defraud.

The record reveals that a delay in deliveries of some equipment should have come as no surprise to Pellerin. Contract Modification No. 3 and the documents transmitted during its negotiation reveal that the parties contemplated April 25, 1999 as a date of *substantial* completion and that pieces of equipment would remain to be installed after that date. The modification expressly provided that if Fluor Daniel delayed delivery of equipment, Pellerin's right to bonuses would not be affected. (Witco's Mem. Supp. Mot. Summ. J., Ex. A at Contract Modification No. 3 at 3; Defs.' Joint Resp. Pl.'s Post–Hr'g Submission, Ex. A at 2–3.) Further, on March 3, 1999, Roger Labas of Fluor Daniel notified

Pellerin that Fluor Daniel recognized that "certain equipment and associated piping will not be possible to include within the targeted completion date [of April 25, 1999] and that this would not be fair." (Defs.' Joint Resp. Pl.'s Post–Hr'g Submission, Ex. A at Ex. 1.) Fluor Daniel accordingly lowered the percentages of completion Pellerin had to achieve to be eligible for performance bonuses, with substantial completion set at 94.3%. Furthermore, Pellerin received all of the performance bonuses, including the $75,000.00 contract completion bonus even though it did not achieve the level of completion targeted for April 25, 1999. (Defs.' Joint Resp. Pl.'s Post–Hr'g Submission, Ex. A at 3.)

The Court has reviewed and found insufficient Pellerin's proffered evidence of fraud, including two submissions received after the hearing on the summary judgment motion. Pellerin offered the affidavit by M. Oliver Soule, Pellerin's president, attesting that Fluor Daniel did not disclose to him that its equipment delivery schedule showed equipment deliveries after the April 25, 1999 project completion date in Contract Modification No. 3. (Pl.'s Mem. Opp'n Defs.' Mots. Summ. J., Ex. P at 2.) Pellerin also produced a copy of a January 29, 1999 schedule, which indicates that five pieces of equipment would not be delivered until May 1999 and notes a mechanical completion date of June 4, 1999. (Pl.'s Supplemental Mem. Opp'n Defs.' Mots. Summ. J., Ex. A.) Pellerin argues that this schedules shows that Fluor Daniel knew, or should have known, that the equipment could not have been delivered in time to meet the April 25, 1999 completion date. In response, Mr. Labas of Fluor Daniel attests that if he did not furnish this schedule to Pellerin, it was through inadvertence, not an intent to deceive. (Defs.' Joint Resp. Pl.'s Post–Hr'g Submission, Ex. A at 2–3.) While the Court does not find Mr. Labas' denial of a fraudulent intent to be controlling, the Court finds that the existence of the schedule is not suggestive of fraud in light of the other evidence that the parties anticipated the possibility of late deliveries.

Pellerin further argues in its brief that the change in Fluor Daniel's compensation motivated Fluor Daniel to keep costs down by not informing Pellerin of the impossibility of its scheduled performance. Pellerin presents no evidence of how Fluor Daniel benefited by withholding this information. Moreover, this conjecture does not make sense in light of the evidence. The various clauses preserving Pellerin's right to bonuses in the event Fluor Daniel failed to deliver equipment on time not only evidence the parties' explicit contemplation of and provision for late deliveries, but also undermine the economic advantage that Fluor Daniel might have obtained from not disclosing delays. (Witco's Mem. Supp. Mot. Summ. J, Ex. A at Contract Modification No. 3 at 2–3.) The Court further notes that Pellerin received its bonuses, notwithstanding the late equipment deliveries.

Finally, Pellerin notes that Mr. Labas testified in his deposition that he received a telephone call from Witco at the very end of February or early March that the delivery of two pieces of equipment, a blender and a centrifuge, would be delayed. (Pl.'s Supplemental Ex. Supp. Opp'n Defs.' Mots. Summ. J., Ex. A at 311, 313.) He then wrote a letter to Phil Fails, Pellerin's site superintendent, in early March, after Pellerin signed Contract Modification No. 3, to inform Pellerin that these two pieces of equipment "were going to be delayed somewhat." (*Id.*, Ex. A at 311.) Although Mr. Labas' testimony indicates that Fluor Daniel possessed information impacting the targeted completion date before Pellerin signed the modification, his testimony does not suggest that

Fluor Daniel intentionally or maliciously withheld that information from Pellerin. As already explained, the parties anticipated and provided for delays in the modification, thereby eliminating any possible economic incentive Fluor Daniel might have had to deceive Pellerin about delays in the project.

 The Court further notes that the alleged fraud only rendered the contract modification voidable. Pellerin received and retained substantial financial benefits under this contract modification. It cannot retain these benefits and yet repudiate the disadvantages of the agreement. *See Galiano v. Galiano*, 34 So.2d 881, 882 (La.1948); *St. Bernard Sav. & Loan Ass'n v. Cella*, 856 F.Supp. 1166, 1173–74 (E.D.La.1994), *aff'd* 55 F.3d 632 (5th Cir.1995). Moreover, to rescind this contract modification for fraud or misrepresentation, Pellerin had to seek rescission shortly after discovering the misrepresentation. *See St. Bernard Sav. & Loan Ass'n*, 856 F.Supp. at 1174. Here, even if Pellerin did not know that delays were inevitable before it signed Contract Modification No. 3, it certainly discovered this in March 1999. Roger Labas testified that he notified Phil Fails, Pellerin's site superintendent, in early March 1999 that defendants would be late in delivering equipment, and Mr. Soule of Pellerin acknowledged Fails' receipt of this communication. (Fluor Daniel's Mem. Supp. Mot. Summ. J., Ex. L at 338–39; Witco's Mem. Supp. Mot. Summ. J., Ex. E at 311–13.) Nevertheless, Pellerin continued to perform under and accept the benefits of Contract Modification No. 3. Furthermore, as discussed below, Pellerin signed eighteen more contract modifications after March of 1999, each of which released any prior claims. These releases included these claims of fraud. The Court accord-

ingly enforces Pellerin's release of claims arising before February 22, 1999.

### 2. Contract Modification Releases

 The defendants further argue that the releases in the subsequent contract modifications preclude any of Pellerin's claims that arose after February 22, 1999. Pellerin and Fluor Daniel entered into twenty-one contract modifications between November 16, 1998 and June 28, 1999. Each contact modification includes the release language quoted earlier, releasing all other claims for additional compensation under the contract arising before the date of the modification. (Witco's Mem. Supp. Mot. Summ. J., Ex. A at Contract Modification Nos. 1–21.) These releases, which are clear and unambiguous, "have the effect of law for the parties." LA. CIV.CODE art.1983. As of the date of each contract modification, Pellerin released *all* other claims for more money, except those claims previously submitted in strict accordance with the contract. These releases specifically included claims for delay or disruption of work, which is what is at issue here. Pellerin has not identified any unpaid claims that it preserved under the contract for which it seeks compensation. As the last four contract modifications are dated *after* Pellerin substantially completed its contractual obligations and demobilized on June 15, 1999, the Court finds that the releases preclude all of Pellerin's claims in this matter. Indeed, the repetition of the release language only underscores their preclusive effect. The Court therefore grants defendants' motions for summary judgment.

### C. Delays

 In the alternative, the Court finds that the no-damages-for-delay provision found in Part III, article 12.3 of the mechanical services contract precludes Pelle-

rin's claims. At oral argument, Pellerin explained that this case is about delays—what caused the delays and who pays for them. Defendants argue that article 12.3 unambiguously precludes all of Pellerin's claims for project delays. Article 12.3 provides: "[Pellerin] shall not be entitled to, and hereby expressly waives recovery of, any damages suffered by reason of delays of any nature, and extension of time shall constitute the sole liability of [Fluor Daniel] and [Witco] and [Pellerin's] sole remedy for delays." (Contract, Part III, art. 12.3.)

To evade the consequences of article 12.3, Pellerin presents two arguments. First, it argues that the boilerplate provisions of Part III have a lower precedence than the project schedule in Part I. Second, Pellerin argues that the doctrine of active interference precludes article 12.3 from barring its claims. The Court will address each argument in turn.

### 1. Lower Precedence

■■ Pellerin first argues that under article 2.0 of the contract, the boilerplate provisions of Part III have a lower precedence than the project schedule in Part I in the event of a conflict. (*Id.*, art. 2.0.) While article 2.0 provides an order of precedence in the event of a conflict, the Court finds that there is no inherent conflict between article 12.3 and the original schedule set forth in Part I. To summarily reject article 12.3 under Pellerin's reasoning defies common sense and renders article 12.3 meaningless. The parties negotiated the risk allocation embodied in article 12.3, and Pellerin is bound by that agreement.

### 2. Active Interference

#### a. The Doctrine

■■ Pellerin also argues that the doctrine of active interference precludes enforcement of the no-damages-for-delay clause of article 12.3 to bar its claims. (*See id.*, Part III, art. 12.3.) Although the doctrine of "active interference" has not attained any precise judicial description, it "clearly implies that more than a simple mistake, error in judgment, lack of total effort, or lack of complete diligence is needed for plaintiff to prove the 'active interference' necessary to render unenforceable an otherwise clear and unambiguous 'no damage' clause." *Peter Kiewit Sons' Co. v. Iowa S. Utils. Co.*, 355 F.Supp. 376, 397, 399 (S.D.Iowa 1973). To be guilty of active interference, defendants had to have committed "some affirmative, willful act, in bad faith, to unreasonably interfere with plaintiff's compliance with the terms of the construction contract." *Id.* at 399.

Pellerin is unable to cite any Louisiana authority adopting the doctrine of active interference. Further, while it cites three Fifth Circuit cases, none of these cases arose under Louisiana law. In the first case, *Bagwell Coatings, Inc. v. Middle South Energy, Inc.*, 797 F.2d 1298, 1305 n. 6 (5th Cir.1986), the Fifth Circuit observed in a footnote that "interference of contractual performance is a breach of contract." *Bagwell Coatings*, however, is a diversity suit applying *Mississippi* law, and it does not purport to recognize the doctrine of active interference under Louisiana law. In the second case, *E.C. Ernst, Inc. v. Manhattan Construction Company of Texas*, 551 F.2d 1026, 1029 (5th Cir.), *modified on other grounds*, 559 F.2d 268 (5th Cir. 1977), the Fifth Circuit explained that courts will strictly construe, but generally enforce, no-damages-for-delay provisions absent, among other reasons, delay amounting to active interference. The Fifth Circuit, however, decided *E.C. Ernst* under *Alabama* law. Accordingly, the opinion is not binding here. In the third

case, *Citizens National Bank of Orlando v. Vitt,* 367 F.2d 541, 544 (5th Cir.1966), the Fifth Circuit stated that in every contract between a contractor and a subcontractor there is an implied promise that the contractor will not prevent, interfere, or hinder the subcontractor in his performance or increase the cost thereof. As in *Bagwell Coatings* and *E.C. Ernst, Citizens National Bank of Orlando* provides no controlling authority because it was decided under *Texas* law. Therefore, in the absence of any Louisiana or controlling Fifth Circuit authority recognizing the doctrine of active interference per se, the Court declines plaintiff's invitation to do so.

### b. Louisiana Remedies

While Louisiana law has not adopted the doctrine of active interference per se, it is not without remedies for an abuse of contractual rights. Louisiana law not only nullifies contractual clauses that exclude or limit a party's liability for intentional or gross fault, but it also imposes an obligation upon parties to perform contracts in good faith. *See* LA. CIV.CODE arts. 1759, 1983, 2004. *See also Pogo Producing Co. v. Shell Offshore, Inc.,* 898 F.2d 1064, 1067 (5th Cir.1990); *Great S.W. Fire Ins. Co. v. CNA Ins. Cos.,* 557 So.2d 966, 967 (La. 1990); *Freeman v. Department of Highways,* 253 La. 105, 217 So.2d 166 (1968).

■ Article 2004 of the Louisiana Civil Code nullifies any contractual clause that, "in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party." LA. CIV.CODE art.2004. In *Freeman v. Department of Highways,* 253

La. 105, 217 So.2d 166 (1968),[2] cited in the comments to article 2004, the Louisiana Supreme Court construed a no-damages-for-delay provision that was very similar to the one at issue here. The Supreme Court upheld the clause, even though the contractor encountered delays of twenty-six months on one engineering services contract and fifteen months on another. The delays were not the fault of the contractor and were caused by the defendant. The Supreme Court held that, under the clause in issue, plaintiff could not recover for delays "whether such delays are caused by the [defendant] or by third persons." *Freeman,* 217 So.2d at 174. The Supreme Court further indicated that a no-damages-for-delay clause could not be invalidated because it permitted a party to stipulate an exemption from its own negligence. The Supreme Court stated:

> No authority is cited for this holding, and we know of none which supports the view that it is against public policy for contracting parties to agree that, in case one of them fails to perform a certain act timely and thus delays the other in the performance of his obligations, the former will not be held responsible for any damages caused by the delay.

*Id.* at 177. The Supreme Court indicated, however, that the no-damages-for-delay clause could not be read as vesting the defendant with the absolute right to prevent plaintiff's performance, because this would make the defendant free to perform or not perform at will. *Id.* at 175–76. As the comment to article 2004 notes, to so limit liability for intentional fault would violate public policy because it would destroy the "overriding principle of good

---

**2.** Pellerin would have this Court rely upon *E.C. Ernst, Inc. v. Manhattan Construction Company of Texas,* 551 F.2d 1026 (5th Cir.), *modified on other grounds,* 559 F.2d 268 (5th Cir.1977), to override *Freeman.* In that case

the Fifth Circuit declined to enforce a no-damages-for-delay clause under certain circumstances. The Fifth Circuit, however, decided *E.C. Ernst, Inc.* under Alabama law, and the opinion is not binding in this matter.

faith." La. Civ.Code art.2004 cmt. a. Thus, under Article 2004 and *Freeman,* the no-damage-for-delay clause is enforceable in the absence of evidence of intentional or gross fault.

██ As to the obligation of good faith, the Louisiana Civil Code does not define "good faith;" rather, it defines "bad faith" as "an intentional and malicious failure to perform." *See* La. Civ.Code art.1997 cmt. c; *American Bank & Trust of Coushatta v. Federal Deposit Ins. Corp.,* 49 F.3d 1064, 1066 (5th Cir.1995); *First Nat'l Bank of Jefferson Parish v. Dazet,* 656 So.2d 1110, 1113 (La.App. 5th Cir.1995). Bad faith involves "some interested or sinister motive" and implies the "conscious doing of a wrong for dishonest or morally questionable motives." *First Nat'l Bank of Jefferson Parish,* 656 So.2d at 1113. *See also National Bldg. & Contracting Co. v. Alerion Bank & Trust Co.,* 772 So.2d 938, 943 (La.App. 4th Cir.2000) ("Bad faith has been defined as 'a designed breach of [contract] from some motive of interest or ill will.'" (quoting *Williams v. Coe,* 417 So.2d 426, 430 (La.App. 1st Cir.1982))). The Louisiana courts have accordingly equated "good faith" with the lack of "bad faith." *American Bank & Trust of Coushatta,* 49 F.3d at 1066.

██ The Court finds no evidence of bad faith, gross fault, or intentional fault on this record. Pellerin blames defendants for incomplete engineering drawings, rescheduling and resequencing its work, crowded work conditions, late delivery of equipment and materials, and changes in the scope of the work. However, the derelictions attributed to defendants are no different in kind or degree than those involved in *Freeman,* in which the Louisiana Supreme Court enforced the no-damages-for-delay clause to bar recovery. *See Freeman,* 217 So.2d at 169–70 (defendant failed to submit plans and specifications timely, changed standards on

many aspects of the work, changed locations and routing of the highway, delayed approving plans and specifications submitted, and relocated and revised bridges, interchanges, and connections).

Further, Pellerin's focus on the change in Fluor Daniel's compensation from a cost reimbursable basis to a lump sum to suggest that Fluor Daniel was motivated by bad faith is neither direct nor circumstantial evidence of bad faith. (Fluor Daniel's Mem. Supp. Mot. Summ. J., Ex. B at 2; Pl.'s Mem. Opp'n Defs.' Mots. Summ. J., Ex. L.) Pellerin reasons that this change in compensation induced Fluor Daniel to manage its new risk exposure and to protect its economic interests by imposing impossible schedules on Pellerin and taking over Pellerin's contract. Fluor Daniel's reaction to this economic motivation, Pellerin asserts, provides the requisite ill will to establish Fluor Daniel's "bad faith."

As evidence of Fluor Daniel's ill will, Pellerin first quotes an April 5, 1999 letter from Alan Boeckmann, president and chief executive officer of Fluor Daniel, to Pat Mackey at Witco that he "agreed to enter into the lump-sum execution mode in order to drive the price to the lowest possible cost for both parties. This would allow one organization to drive the decisions and performance to meet this objective." (Pl.'s Mem. Opp'n Defs.' Mots. Summ. J., Ex. M.) The Court rejects Pellerin's sinister interpretation of Mr. Boeckmann's failure to mention Pellerin as a beneficiary of the drive to lower costs. The letter was from Fluor Daniel to Witco, addressing *their* relationship. There was no reason for Fluor Daniel to mention Pellerin in that context. Accordingly, the letter does not implicate Fluor Daniel's duty of good faith with respect to Pellerin.

Pellerin also quotes a confidential November 4, 1998 memorandum from Francisco Ramirez, Fluor Daniel's contract manager, as evidence of Fluor Daniel's ill

will. In the memorandum Mr. Ramirez states: "[I]n view of the potential change of the relationship between Fluor Daniel and [Witco], it becomes necessary to implement changes to the existing contract to protect and manage the company's risk exposure and economic interest." (*Id.*, Ex. N at 1.) Pellerin, however, neglects to quote the preceding paragraph, which states:

> In view of [Pellerin's] inability to produce a cost effective and timely schedule recovery plan and construction management's perception that they may be unable to adequately perform the job, it is necessary for Fluor Daniel to take over the management and supervision of this work to insure successful completion of the project.

(*Id.*, Ex. N at 1.) Moreover, the first step of Mr. Ramirez's recommended plan to transition some of the work being performed by Pellerin to Fluor Daniel is to

> [c]ontact management to contact Pellerin's president to let them know Fluor Daniel's concerns and to ask full cooperation in the transition. This will be based on an [sic] win-win approach, i.e., we believe that Fluor Daniel taking over the work as outlined herein will be in the best interests of Pellerin, Witco, and Fluor Daniel.

(*Id.*, Ex. N at 2.)

Again, despite Pellerin's sinister interpretation of this memorandum, the Court finds Fluor Daniel's concerns and proposals to be consistent with its duty of good faith. Under the terms of the contract, Fluor Daniel could exercise more control over Pellerin in the event Pellerin's performance was not in compliance with the schedule, which the memorandum suggests it was not. (*See, e.g.,* Contract, Part III, art. 10.2.) Moreover, notwithstanding the particular provisions of article 10.2, Mr. Ramirez's expressions of concern and proposals are consistent with sound project

management, not a malicious intent to damage Pellerin. Indeed, he recommends discussing Fluor Daniel's concerns with Pellerin to achieve an amicable solution benefiting *both* companies.

Pellerin further cites a confidential e-mail in which the author reviews Fluor Daniel's options with respect to Pellerin, including the "preferred" option of turning Pellerin into a "body shop." (Pl.'s Mem. Opp'n Defs.' Mots. Summ. J., Ex. O at 1.) Pellerin interprets this e-mail as proof that Fluor Daniel maliciously took over Pellerin's contract. As a preliminary matter, the Court notes that the e-mail merely expresses a preference. It is not evidence that Fluor Daniel actually "took over" Pellerin's contract. With respect to the evidence of ill will in the e-mail, the Court notes that the e-mail was written in the context of Fluor Daniel's concerns about Pellerin's performance. The author discusses the option of "baby sitting" Pellerin and remarks that "if Pellerin is not substantially complete by 31DEC98, they are in default of their contract." (*Id.*, Ex. O at 1.) While the proposed solutions include extreme options, this context belies Pellerin's suggestion of ill will.

Finally, Pellerin quotes the deposition testimony of Willie Lee McBride, Fluor Daniel's former projects manager, that "if Fluor Daniel had not had a dispute with Witco and would have left Pellerin alone to do their work, they would have gained more progress towards their planning." (*Id.*, Ex. F at 290.) This testimony does not implicate Fluor Daniel's duty of good faith. Mr. McBride merely expresses an opinion that Pellerin would have performed better if Fluor Daniel had "left Pellerin alone." He does not suggest that Fluor Daniel's actions exceeded its contractual authority or were motivated by ill will.

Having found that there is no evidence that Fluor Daniel intentionally and mali-

ciously interfered with Pellerin's contractual rights, the Court rejects Pellerin's contention that Fluor Daniel breached its duty of good faith. The summary judgment record simply does not raise an issue of fact that the delays experienced by Pellerin were the product of Fluor Daniel's intentional or gross fault or bad faith. The Court therefore finds that article 12.3 precludes Pellerin's claims and grants defendants' motions for summary judgment for this alternative reason.

## D. Quantum Meruit

Defendants also move to dismiss Pellerin's alternative claim that it is entitled to recovery under a theory of quantum meruit. Pellerin seeks to recover quantum meruit under the doctrine of cardinal change and Louisiana law.

### 1. Cardinal Change Doctrine

Pellerin argues that the resequencing of the project and the delays caused by Fluor Daniel constitute cardinal changes, entitling it to recover in quantum meruit. A cardinal change is a "drastic modification beyond the scope of the contract" that altered the nature of the thing to be constructed. *Air–A–Plane Corp. v. United States,* 187 Ct.Cl. 269, 408 F.2d 1030, 1033 (1969). By definition, a cardinal change is "so profound that it is not redressable under the contract." *Atlantic Dry Dock Corp. v. United States,* 773 F.Supp. 335, 339 (M.D.Fla.1991). Accordingly, when an owner or its agent has abused its power, the theory of cardinal change allows a contractor in a losing contract to bring an action for material breach of contract, alleging that the ordered changes exceed the parties' reasonable expectations. *See L.K. Comstock & Co. v. Becon Constr. Co.,* 932 F.Supp. 906, 937 (E.D.Ky.1993).

Pellerin, however, fails to cite, and the Court is unable to discover, any Louisiana authority recognizing the cardinal change doctrine. The lone Fifth Circuit case that Pellerin cites, *Nat Harrison Associates, Inc. v. Gulf States Utilities Company,* 491 F.2d 578, 583 (5th Cir.1974), cites two Court of Claims cases for the premise that a contractor could be compensated for changes in the scope of the work despite its failure to submit written claims for the extra work. None of the cases cited by Pellerin holds that a cardinal change creates an exception to the enforcement of a contract precluding damages for *delay.* Rather, the cases indicate that the doctrine can limit an owner's ability under a *changes clause* to order changes beyond a contractor's original scope of work. *See Air–A–Plane Corp.,* 408 F.2d at 1032–33; *L.K. Comstock & Co.,* 932 F.Supp. at 936–44; *Atlantic Dry Dock Corp.,* 773 F.Supp. at 338–39. Even if the doctrine of cardinal change were applicable, the changes in the scope of the project in this case were not so drastic or profound that they altered the nature of the thing to be constructed. Essentially, the problem Pellerin confronted was delay, not changes in the nature of the project it was asked to perform.

### 2. Louisiana Law

Pellerin also seeks to recover quantum meruit under Louisiana law. Quantum meruit, however, is not recognized in Louisiana law as a substantive basis for recovery because it "is only used as a measure of compensation or price in quasi contract or when none is stated in a contract." *Bieber–Guillory v. Aswell,* 723 So.2d 1145, 1150 (La.App. 3d Cir.1998) (quoting *SMP Sales Mgmt., Inc. v. Fleet Credit Corp.,* 960 F.2d 557, 560 (5th Cir. 1992)). *See also Morphy, Makofsky & Masson, Inc. v. Canal Place 2000,* 538 So.2d 569, 574–75 (La.1989). The analysis is more properly made under the doctrine of unjust enrichment, and it is "well settled" under Louisiana law that "recovery

on a theory of quantum meruit or unjust enrichment is permitted only in the absence of a contract." *Union Tex. Petroleum Corp. v. Mid. La. Gas Co.*, 503 So.2d 159, 165 (La.App. 4th Cir.1987) (citing *Creely v. Leisure Living, Inc.*, 437 So.2d 816 (La.1983); *Miller v. Housing Auth. of New Orleans*, 249 La. 623, 190 So.2d 75, 81 (1966)). *See also Marple v. Kurzweg*, 902 F.2d 397, 401 (5th Cir.1990); *Bieber–Guillory*, 723 So.2d at 1150 (citing cases). As it is clear that there is a contract between Pellerin and defendants that governs the rights of the parties, the Court finds that Pellerin cannot recover under a theory of quantum meruit or unjust enrichment and dismisses those claims.[3]

## III. CONCLUSION

For the foregoing reasons, the Court grants defendants' motions for summary judgment.

---

3. Because the Court has determined that Pellerin's claims under the contract and for quantum meruit are without merit, it need not reach the merits of Fluor Daniel's arguments regarding agency.